*** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 Electronically Filed
 Supreme Court
 SCAP-30603
 15-AUG-2012
 09:14 AM

 IN THE SUPREME COURT OF THE STATE OF HAWAI#I

 ---o0o---

 IN RE #ÎAO GROUND WATER MANAGEMENT AREA HIGH-LEVEL
 SOURCE WATER USE PERMIT APPLICATIONS AND PETITION
 TO AMEND INTERIM INSTREAM FLOW STANDARDS OF
 WAIHE#E RIVER AND WAIEHU, #ÎAO, AND WAIKAPÛ
 STREAMS CONTESTED CASE HEARING

 NO. SCAP-30603

 APPEAL FROM THE COMMISSION ON WATER RESOURCE MANAGEMENT
 (CASE NO. CCH-MA06-01)

 AUGUST 15, 2012

 RECKTENWALD, C.J., NAKAYAMA, AND MCKENNA, JJ.,
 AND CIRCUIT JUDGE TRADER, IN PLACE OF DUFFY, J., RECUSED,
 WITH ACOBA, J., CONCURRING SEPARATELY

 OPINION OF THE COURT BY NAKAYAMA, J.

 I. INTRODUCTION

 Nâ Wai #Ehâ, or “the four great waters of Maui,” is the

collective name for the Waihe#e River and the Waiehu, #Îao, and

Waikapû Streams. The case before the court began in June 2004

when Petitioners-Appellants/Cross-Appellees Hui1 O Nâ Wai #Ehâ

 1
 A “hui” is defined as, inter alia, a “[c]lub, association,
society, corporation, company, institution, organization, band, league, firm,
joint ownership, partnership, union, alliance, troupe, [or] team.” Mary
 continue...
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

and Maui Tomorrow Foundation, Inc. (“Hui/MTF”), through

Earthjustice, petitioned Appellee/Cross-Appellee Commission on

Water Resource Management (“the Commission”) to amend the Interim

Instream Flow Standards (“IIFS”) for Nâ Wai #Ehâ, which had been

in place since 1988. Around the same time, several parties,

including Applicant-Appellee/Cross-Appellant Maui County

Department of Water Supply (“MDWS”), and Applicants-

Appellees/Cross-Appellees Hawaiian Commercial & Sugar Company

(“HC&S”) and Wailuku Water Company (“WWC”), filed Water Use

Permit Applications (“WUPA”) for the same area. The Commission

held a combined case hearing to resolve the IIFS and WUPA; in

addition to the petitioner and applicants, the Office of Hawaiian

Affairs (“OHA”) applied to participate in the hearing. The

current appeal seeks review of the Commission’s resulting

Findings of Fact, Conclusions of Law (“FOF/COL”), and Decision

and Order (“D&O”), in which the Commission amended the IIFS for

two of the four streams, and substantially retained the existing

IIFS for the two remaining streams as measured above diversions.2

The FOF/COL and D&O also resolved several WUPA; the Commission’s

 1
 ...continue
Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary 86 (rev. ed. 1986).

 2
 The Commission’s FOF/COL D&O differs from the 1988 IIFS in one
important respect. In 1988, the Commission set the IIFS as the status quo at
that time “without further amounts of water being diverted offstream through
new or expanded diversions.” Haw. Admin. Rules § 13-169-48 (1988). The
FOF/COL D&O states that the IIFS will “remain” as established above
diversions, but does not contain the restriction limiting new or expanded
diversions.

 2
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

resolution of the WUPA is not before the court on appeal.

 Hui/MTF and OHA appeal on related grounds. Their

primary complaint is that the Commission erred in balancing

instream and noninstream uses, and therefore the IIFS do not

properly protect traditional and customary native Hawaiian

rights, appurtenant water rights, or the public trust. Both

parties also contest the Commission’s treatment of diversions,

including the alternative source Well Number 7 (“Well No. 7”), a

water well on HC&S’s plantation that could be used to irrigate

HC&S’s cane fields. The parties contest the Commission’s

determination that HC&S will not be required to pump Well No. 7

to its full capacity, a decision that resulted in a higher

estimated allowable diversion for HC&S, and lower IIFS for the

streams.

 MDWS’s cross-appeal asks the court to clarify the

priority of noninstream municipal use in setting the IIFS.

 And finally, the Commission, HC&S, and WWC argue that

the court does not have jurisdiction to hear Hui/MTF’s and OHA’s

appeals.

 As explained below, the court holds that it has

jurisdiction in the instant case, and takes this opportunity to

expand upon the jurisdictional analysis from In re Water Use

Permit Applications “Waiâhole I”, 94 Hawai#i 97, 9 P.3d 409,

(2000). In reviewing Hui/MTF’s and OHA’s points of error, the

 3
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

court concludes that the Commission on Water Resource Management

erred in several respects. First, in considering the effect of

the IIFS on native Hawaiian practices in Nâ Wai #Ehâ, the

Commission failed to enter findings of fact and conclusions of

law regarding the effect of the amended IIFS on traditional and

customary native Hawaiian practices in Nâ Wai #Ehâ, and regarding

the feasibility of protecting any affected practices. Second,

the Commission’s analysis of instream uses was incomplete, as it

focused on amphidromous species and did not fully consider other

instream uses to which witnesses testified during the hearings.

Third, the Commission erred in its consideration of alternative

water sources and in its calculation of diverting parties’

acreage and reasonable system losses. The court must vacate the

Commission’s June 10, 2010 Findings of Fact, Conclusions of Law,

Decision and Order, and remand the case for further proceedings.

 II. BACKGROUND

A. Nâ Wai #Ehâ Water Systems

 1. Surface Water3

 Nâ Wai #Ehâ are the Waihe#e River and Waiehu, #Îao, and

 3
 “‘Surface water’ means both contained surface water—that is, water
upon the surface of the earth in bounds created naturally or artificially
including, but not limited to, streams, other watercourses, lakes, reservoirs,
and coastal waters subject to state jurisdiction—and diffused surface
water—that is, water occurring upon the surface of the ground other than in
contained water bodies. Water from natural springs is surface water when it
exits from the spring onto the earth’s surface.” Hawai#i Revised Statutes
(“HRS”) § 174C-3 (1993). Diffused surface water is “Water, such a rainfall
runoff, that collects and flows on the ground but does not form a
watercourse.” Black’s Law Dictionary 1728 (9th ed. 2009).

 4
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Waikapû Streams. The Waihe#e River is the principal water source

in Nâ Wai #Ehâ; it is about 26,585 feet long, and its watershed

covers 4,500 acres. From 1984-2005, United States Geological

Survey (“USGS”) data shows streamflow upstream of all diversions

as follows: the Q504 flow was 34 million gallons per day (“mgd”),

the Q705 flow was 29 mgd, the Q90 flow was 24 mgd, and the Q100

flow was 14 mgd. The Waihe#e River’s two main diversions are

Waihe#e Ditch and Spreckels Ditch. See Section II.A.3., infra,

for more information about the ditches. The two ditches are

capable of diverting all of the dry-weather flow available at the

intakes, however, even if all the water is being diverted,

streamflow immediately downstream of the intakes may exist

because of leakage through or subsurface flow beneath the dams at

these sites. The dry-weather flow downstream of the intakes is

commonly about 0.1 mgd, but the stream may not have continuous

mauka-to-makai surface flow.

 The Waiehu Stream is formed by the confluence of North

and South Waiehu Streams; it is about 23,700 feet long, and its

 4
 Discussions of the volume of water in a stream utilize flow-
duration curves to express the percentage of time that streamflows were
equaled or exceeded during a given period of record. The Q50 flow, also known
as the median flow, is the flow that is equal or exceeded 50 percent of the
time; the Commission found that the Q50 flow is “reflective of typical flow
conditions.”

 5
 To illustrate the previous footnote, the Q70 flow is the volume of
water that is equaled or exceeded 70 percent of the time during any given time
period. The Waihe#e River showed streamflows of at least 29 mgd 70 percent of
the time from 1984-2005.

 5
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

watershed covers about 6,600 acres. Gaging stations on both

branches of the Waiehu Stream were discontinued in 1917, but USGS

used historical data and record-extension techniques to estimate

flows above all diversions for North Waiehu Stream from 1984-2005

as follows: the Q50 flow was between 3.1 to 3.6 mgd, the Q70 flow

was between 2.3 to 2.7 mgd, the Q90 flow was between 1.4 to 2.7

mgd, and the Q100 flow was 1.6 mgd (as measured in March 1915).

For South Waiehu Stream, USGS utilized the same record extension

techniques, and estimated the 1984-2005 flows as follows: the Q50

flow was between 2.4 to 4.2 mgd, the Q70 flow was between 1.9 to

2.8 mgd, the Q90 flow was between 1.3 to 2.0 mgd, and the Q100

flow was 1.5 mgd (recorded in July 1913). The Waihe#e and

Spreckels Ditches divert water from both North and South Waiehu

Streams; in addition, the North Waiehu Ditch diverts from the

North Waiehu Stream and the Cerizos Kuleana Ditch diverts from

the South Waiehu Stream. There is extensive channel erosion

below the Spreckels Ditch on South Waiehu Stream, with a 12-foot

drop in the elevation of the stream just below the diversion, and

there is a vertical concrete apron located in Waiehu Stream.

Most of the water is diverted from North and South Waiehu Streams

at the North Waiehu Ditch and Spreckels Ditch, respectively; due

to these diversions and leakage, Waiehu Stream does not flow

continuously from mauka to makai.

 #Îao Stream is the second-largest stream in Nâ Wai #Ehâ;

 6
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

it is about 38,000 feet long, and its watershed covers about

14,500 acres. USGS calculated the 1984-2005 flows above all

diversions as follows: the Q50 flow was 25 mgd, the Q70 flow was

18 mgd, the Q90 flow was 13 mgd, and the Q100 flow was 7.1 mgd.

The two main diversions off the #Îao Stream are the #Îao-

Waikapû/#Îao-Maniania Ditches at an altitude of 780 feet, and the

Spreckels Ditch at 260 feet. The United States Army Corps of

Engineers channelized significant portions of #Îao Stream’s lower

reaches and hardened the stream bed and banks with concrete for

flood control and drainage. About 2.5 miles above the mouth of

the Stream, the concrete channel includes a 20-foot vertical

drop. USGS estimates that #Îao Stream loses 6.3 mgd in reaches

downstream of the #Îao-Maniania ditch diversion that are not

lined with concrete. In absence of ditch return flows or runoff

during and following rainfall, #Îao Stream is dry and does not

flow continuously from mauka to makai.

 The Waikapû Stream is the southern-most stream and the

longest of the four streams; it is about 63,500 feet in length,

with a watershed of about 9,000 acres. USGS, using record

extension techniques, estimated the 1984-2005 flows above all

diversions as follows: the Q50 flow was between 4.8 to 6.3 mgd,

the Q70 flow was between 3.9 to 5.2 mgd, and the Q90 flow was

between 3.3 to 4.6 mgd. The lowest recorded flow for Waikapû

Stream was 3.3 mgd, in October 1912. There are three diversions

 7
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

off the Waikapû Stream: the South Side Waikapû Ditch (also known

as the South Waikapû Ditch) near an altitude of 1,120 feet, the

Waihe#e Ditch, and the Reservoir 6 Ditch. The Waikapû Stream is

commonly dry downstream of all diversions, both because of the

diversions and because of infiltration losses into the streambed;

the Stream does not flow continuously from mauka to makai.

 2. Ground Water6

 There are three types of ground water in Nâ Wai #Ehâ

water systems: dike-impounded, the basal freshwater lens, and

perched. Dike-impounded ground waters occur at high elevations;

basal freshwater lenses and perched waters occur at lower

elevations and closer to the coast.

 The dikes at higher elevations are low-permeability, so

water builds up behind them. The upper reaches of Nâ Wai #Ehâ

streams intersect the dike-impounded ground water so the upper

reaches have year-round streamflow, even during dry periods. The

portions of the stream joined by the dike-impounded water are

described as “gaining” because ground water contributes to

streamflow.

 The basal freshwater lens system is contained in

volcanic rocks and sedimentary deposits. Perched water also

 6
 “‘Ground water’ means any water found beneath the surface of the
earth, whether in perched supply, dike-confined, flowing, or percolating in
underground channels or streams, under artesian pressure or not, or
otherwise.” HRS § 174C-3.

 8
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

occurs in the sedimentary deposits. In the lower reaches of the

streams where an unsaturated zone exists between the streams’

channel bottoms and the water table, stream waters migrate from

the stream beds to the basal lenses, and the streams are

described as “losing.” Some of the stream channels intersect the

basal freshwater lens near the mouths of the streams, making the

streams “gaining” in those areas.

 The Commission considered the IIFS for Nâ Wai #Ehâ with

the WUPA for the high-level dike-impounded ground water. As the

Hearings Officer, Dr. Lawrence H. Miike, explained, the

Commission decided to combine the issues into one contested case

hearing because the water systems are all connected and

considering the WUPA and IIFS together would allow the Commission

“to get a bigger picture and to be able to try to reach a more

rational and reasonable decision . . . .” One example of the

interconnectedness of the high-level dike-impounded ground water

and the surface waters is the tunnel system. Several tunnels tap

dike-impounded ground water and discharge directly into the

streams. In some cases, denial of a WUPA for dike-impounded

ground water results in additional water contributing to

streamflow.

 3. Ditches

 There are two primary and two secondary systems that

distribute water diverted from Nâ Wai #Ehâ. The primary systems

 9
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

are WWC’s ditch system and HC&S’s reservoir/ditch system. Nine

active diversions feed the primary distribution system: two on

Waihe#e River, one on North Waiehu Stream, one on South Waiehu

Stream, two on #Îao Stream, and three on Waikapû Stream. There

are two major ditches in the system: the Waihe#e and Spreckels

Ditches. The WWC distribution system involves eleven registered

stream diversions, two major ditches, seven minor ditches, and

sixteen reservoirs; HC&S shares in the cost and maintenance of

portions of this system. HC&S also operates a diversion intake

on South Waiehu Stream at the Spreckels Ditch, a diversion intake

on #Îao Stream at the Spreckels Ditch, and the Spreckels Ditch

from Reservoir 25 to its terminus at HC&S’s Reservoir 73. The

waters that enter the distribution system travel by gravity flow

in primary ditches through uplands into reservoirs that in turn

deliver the water into smaller ditches for end use.

 The secondary systems are the so-called “kuleana”7

ditches/pipes that either have an intake directly in a stream or

receive water from the primary systems and the MDWS water

treatment plants. The Commission identified seventeen kuleana

ditch/pipe systems. Fourteen kuleana systems are connected to

the primary distribution systems; three kuleana intakes connect

 7
 The term “kuleana” is used by the parties to describe the
distribution system and users who were not charged for water delivery; whether
the users have riparian or appurtenant rights had not been determined at the
time of the Commission’s hearings.

 10
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

directly to the streams.

B. Procedural History

 On July 21, 2003, the Commission designated the #Îao

Aquifer System a Ground Water Management Area (“GWMA”). After a

water source is designated as a GWMA, existing users have one

year to file WUPA. See Hawai#i Revised Statutes (“HRS”) § 174C-

50(c) (1993) (“An application for a permit to continue an

existing use must be made within a period of one year from the

effective date of designation.”) The water code provides that

the Commission may issue permits for existing reasonable and

beneficial uses, and places the burden of proof on the applicant

to show that it satisfies the relevant criteria. HRS §§ 174C-

49(a), 174C-50 (1993). As discussed in the following subsection,

several parties filed such WUPA for ground water sources.

 The water code also provides that “[a]ny person with

the proper standing may petition the commission to adopt an

interim instream flow standard for streams in order to protect

the public interest pending the establishment of a permanent

instream flow standard.” HRS § 174C-71(2)(A) (1993). Hui/MTF

filed such a petition; it is the Commission’s resolution of this

petition that is currently before the court on appeal.

 On March 13, 2008, during the pendency of the Hearings,

the Commission also designated the four streams of Nâ Wai #Ehâ a

Surface Water Management Area (“SWMA”). Like the GWMA

 11
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

designation, the SWMA designation triggered WUPA requirements.

The resolution of those WUPA are not currently before the court,

but they are relevant because the Commission utilized estimates

of expected surface water use permits in determining the IIFS for

the water system.

 1. Water Use Permit Applications

 MDWS, HC&S, and WWC’s predecessor in interest, Wailuku

Agribusiness Company, Inc.,8 filed timely WUPA for #Îao Aquifer

sources. Hui/MTF and OHA filed objections to the WUPA. The

Commission held public hearings on the WUPA on October 28, 2004;

April 22, 2005; and February 2, 2006. Prior to the close of the

third hearing, several attendees, including MDWS, WWC, Hui/MTF,

and OHA, verbally requested that the Commission hold a Contested

Case Hearing (“CCH”) regarding the WUPA. Subsequently, the

parties filed written petitions to that effect.

 2. Petition to Amend Interim Instream Flow Standards

 In June of 2004, Hui/MTF filed a Petition to Amend

Interim Instream Flow Standards. In its petition, Hui/MTF argued

that the then-existing standards, which had been in place since

1988, lacked any scientific basis and merely preserved the status

quo without addressing the public trust, environmental concerns,

native Hawaiian practices, outdoor and recreational activities,

 8
 WWC filed Requests to Transfer Wailuku Agribusiness’s permits to
WWC.

 12
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

or aesthetic and scenic values, as required by the water code.

Hui/MTF requested that the Commission establish scientifically-

based IIFS and order restoration of all streamflows not currently

put to beneficial use.

 HC&S and Wailuku Agribusiness Company filed comments to

the petition, largely arguing that their use is reasonable and

beneficial, that the petition did not prove the necessity of

establishing new standards, and that the Petition did not show

how native Hawaiian practitioners would use the water or how much

they would need to use. Hui/MTF responded that the burden falls

on the Commission, not on Hui/MTF, to determine reasonable IIFS

and to protect instream public trust uses and native Hawaiian

rights.

 3. Contested Case Hearing

 At its February 15, 2006 meeting, the Commission

decided that a CCH would be held for the ground water WUPA and

the IIFS together. On May 4, 2006, the Commission released a

“Notice of a Combined Contested Case Hearing (CCH-MA-06-01)

Concerning Water Use Permit Applications For Maui Department of

Water Supply, Hawaiian Commercial and Sugar, and Wailuku Water

Company, LLC; Iao Ground Water Management Area, Maui, and

Petitions to Amend the Interim Instream Flow Standards for Iao,

Waiehu, Waihee, & Waikapu Streams.” One of the Commissioners,

Dr. Lawrence Miike, was appointed Hearings Officer. After a

 13
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

hearing, Dr. Miike granted standing to five of the parties

presently before the court: HC&S, Hui/MTF, MDWS, OHA, and WWC.

 Dr. Miike held twenty-three days of hearings between

December 3, 2007 and March 4, 2008; by the end of the evidentiary

phase of the hearing, seventy-seven witnesses had testified and

over six hundred exhibits had been accepted into evidence. After

the conclusion of the Hearings, Dr. Miike reopened evidence, on

motions of two parties, to admit two additional exhibits: HC&S

offered a study it commissioned from John Ford, an environmental

consultant, which had not been completed at the time of the

Hearing, and OHA offered a portion of an Environmental Impact

Statement Preparation Notice for the Wai#ale Water Treatment

Facility. HC&S, MDWS, WWC, and Hui/MTF submitted proposed

Findings of Fact and Conclusions of Law. OHA joined Hui/MTF’s

proposals.

 4. Dr. Miike’s Proposed Findings of Fact, Conclusions of
 Law, Decision and Order

 On April 9, 2009, Dr. Miike released his proposed

FOF/COL D&O (“Proposed FOF/COL”). The Proposed FOF/COL consisted

of 617 FOF regarding Nâ Wai #Ehâ’s water systems, fish and

wildlife habitats, traditional and customary native Hawaiian

practices, users and uses, and the projected economic impact of

restricting noninstream uses. The Proposed FOF/COL also included

297 COL, on topics including instream values, users and uses,

 14
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

alternative water resources, system losses, economic impacts of

restricting noninstream uses, IIFS, and WUPA. Many of the

Proposed FOF/COL were ultimately adopted by the Commission in the

final FOF/COL, as discussed in subsequent sections, infra.

 Dr. Miike’s Proposed Decision amended the IIFS for all

four streams, as follows: the IIFS for the Waihe#e River would be

14 mgd downstream of diversions; for North and South Waiehu

Streams, the IIFS would be 2.2 mgd and 1.3 mgd, respectively; for

#Îao Stream, the IIFS would be 13 mgd; and for Waikapû Stream,

the IIFS would be 4 mgd, with contingencies to adjust the IIFS or

its point of measurement. The proposed IIFS limited diversions

enough to increase streamflow to a level that should have

established mauka-to-makai flow in all four streams. The

Proposed FOF/COL also concluded that Well No. 7 is an alternative

source for HC&S, and that it can supply 14 mgd of HC&S’s water

requirements.

 The Commission permitted parties to file written

Exceptions to Dr. Miike’s Proposed FOF/COL and D&O; each party

filed such Exceptions. On October 15, 2009, the Commission

convened to hold a hearing on the parties’ Exceptions.

 In their written exceptions and their presentations to

the Commission, Hui/MTF and OHA argued that the IIFS should be

higher for several reasons. They argued that the Commission

should allow fewer commercial diversions because the companies’

 15
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

actual water needs are lower than the Commission’s estimates,

that the diverting parties should be required to eliminate system

waste by lining ditches and reservoirs, and that HC&S should be

required to pump Well No. 7 to full capacity. Regarding kuleana

rights, Hui/MTF and OHA claimed that while the provisions made

for kuleana users were adequate for current and planned uses of

kuleana users who testified, they were inadequate to provide for

all kuleana users in the system. Furthermore, they argued that

the Commission should not defer to future proceedings for

determinations of appurtenant rights and the reasonable-

beneficial uses of noninstream users.

 MDWS objected to several of the Proposed FOF/COL. MDWS

argued that the IIFS for #Îao Stream would restrict diversions

such that it could not operate its #Îao Water Treatment Facility

to serve domestic needs of Maui residents. MDWS also objected to

several of the Proposed FOF/COL indicating that the IIFS should

be set without considering “offstream public trust uses, such as

the public water supply.”

 WWC’s exceptions argued that the Proposed FOF/COL did

not properly balance instream and noninstream uses, and were too

severe in their limitations of noninstream uses. WWC argued that

nothing in the water code required the Commission to establish

mauka-to-makai streamflows, and that the Proposed FOF/COL’s

efforts to do so reflect an improper emphasis on instream values.

 16
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 HC&S offered similar exceptions, arguing that the

Proposed FOF/COL tipped the balance too sharply in favor of

stream restoration. HC&S encouraged the Commission to consider

the water system as a whole, instead of focusing on

reestablishing mauka-to-makai streamflow in each individual

stream. HC&S also argued that the Proposed FOF/COL did not

adequately consider the economic impact of restricting HC&S’s

noninstream uses or of requiring HC&S to pump Well No. 7. HC&S

emphasized that it employed about eight hundred workers on Maui,

and that reduction in water “would jeopardize the viability of

HC&S.” If HC&S were to cease operation, HC&S argued, those eight

hundred jobs, and the HC&S’s other substantial contributions to

the Maui economy would be lost.

 5. The Commission’s Final Findings of Fact, Conclusions of
 Law, Decision and Order

 On June 10, 2010, the Commission released its final

FOF/COL and D&O. The Commission reached 617 FOF and 276 COL,

adopting most of the Proposed FOF/COL but revisiting some. Most

notably, the D&O amended the IIFS for only the Waihe#e River (to

10 mgd) and the North and South Waiehu Streams9 (to 1.6 and 0.9

 9
 The IIFS for South Waiehu Stream has not been implemented.
Hui/MTF, OHA, MDWS, WWC, and HC&S entered into a series of stipulations
suspending the implementation; the Commission approved each stipulation. The
impetus for the stipulations appears to be complaints from kuleana users who
did not participate in the CCH and who take water from the ditch system off
South Waiehu Stream. South Waiehu Stream was one of the streams for which
actual streamflow measurements were not available at the time of the hearings;
the Commission utilized USGS estimates based on record extension techniques to
 continue...

 17
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

mgd, respectively); it maintained the status quo, thereby not

restricting any of the parties’ diversions, for the #Îao and

Waikapû Streams. It also lowered the amount of water HC&S was

required to pump from Well No. 7 to 9.5 mgd, a significant

decrease of 4.5 mgd from the Proposed FOF/COL.

 Dr. Miike dissented from the decision. Dr. Miike

agreed with the Commission majority regarding water requirements

for kuleana users, MDWS, and WWC. Dr. Miike also agreed with

most of the analysis regarding HC&S’s irrigation requirements.

The basis for Dr. Miike’s dissent was the Commission majority’s

allocation of water between instream uses and HC&S’s diversions.

His strongest objection was to the Commission’s treatment of Well

No. 7; Dr. Miike would have required HC&S to pump higher

quantities of water from the well during dry-weather conditions,

thereby retaining more water in the streams for instream and

downstream uses. Dr. Miike argued that the Commission’s decision

reflected a residual approach in that it set the IIFS as the

amount of water remaining after satisfying all noninstream uses.

 Last, Dr. Miike objected to the Commission majority’s evaluation

of the economic impact of restricting HC&S’s water. He asserted

 9
 ...continue
set the IIFS. In the time since the first stipulation, the Commission has
worked on collecting actual streamflow data, and it started the process of
determining and quantifying appurtenant rights of users on South Waiehu
Stream. HC&S repaired a portion of its diversion infrastructure, and the
parties have discussed modifications to the ditch system, pending final
determination of appurtenant rights.

 18
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

that the Commission cannot assume that the Proposed FOF/COL would

have resulted in HC&S’s “doomsday scenario” in which the water

restrictions render its entire operation impractical. Dr. Miike

argued that the accurate point of analysis would be the economic

effect of limiting availability of water to the 15 percent of

HC&S’s fields that are in west Maui. Dr. Miike noted that,

rather than providing this analysis, HC&S “instead outlined the

consequences if its entire 35,000 acre sugar operations were

ended.” As Dr. Miike explained:
 Absent an economic analysis by HC&S, the Commission cannot
 assume that HC&S’s doomsday scenario would result from an
 occasional 10.5 to 13.4 percent decrease of its irrigation
 requirements for 15 percent of its entire operations. Those
 decreases equate to only 1.6 to 2.0 percent of its
 irrigation requirements for its entire 35,000-acre
 operations, and then only on an occasional basis. In the
 absence of any information supporting its doomsday scenario,
 the Commission could not assume that HC&S’s assertions
 overcame the presumption in favor of the public trust
 resource, the streams of Nâ Wai #Ehâ.

Dr. Miike concluded that the Commission majority “has failed in

its duties under the Constitution and the State Water Code as

trustee of the state’s public water resources.”

 6. Appellate Filings

 On July 14, 2010, OHA and Hui/MTF filed their Notices

of Appeal. On July 30, 2010, MDWS filed its Notice of Cross-

Appeal. On February 23, 2011, MDWS, OHA, and Hui/MTF filed their

Opening Briefs in the Intermediate Court of Appeals. On April

18, 2011, Hui/MTF filed an application to transfer the case to

the supreme court; OHA joined this motion. On June 23, 2011,

 19
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

this court accepted the application for transfer.

 III. STANDARDS OF REVIEW

A. Judicial Review of the Water Commission’s Decisions

 The water code provides that “[j]udicial review of

rules and orders of the commission under this chapter shall be

governed by chapter 91. Trial de novo is not allowed on review

of commission actions under this chapter.” HRS § 174C-12 (1993).

Chapter 91 articulates the standards of review applicable to

appeals of agency decisions and provides:
 Upon review of the record the court may affirm the decision
 of the agency or remand the case with instructions for
 further proceedings; or it may reverse or modify the
 decision and order if the substantial rights of the
 petitioners may have been prejudiced because the
 administrative findings, conclusions, decisions, or orders
 are:

 (1) In violation of constitutional or statutory
 provisions; or
 (2) In excess of the statutory authority or
 jurisdiction of the agency; or
 (3) Made upon unlawful procedure; or
 (4) Affected by other error of law; or
 (5) Clearly erroneous in view of the reliable,
 probative, and substantial evidence on the whole
 record; or
 (6) Arbitrary, or capricious, or characterized by
 abuse of discretion or clearly unwarranted exercise of
 discretion.

HRS § 91-14 (g) (1993). “This court’s review is . . . qualified

by the principle that the agency’s decision carries a presumption

of validity, and appellant has the heavy burden of making a

convincing showing that the decision is invalid because it is

unjust and unreasonable in its consequences.” In re Wai#ola O

Moloka#i, Inc., 103 Hawai#i 401, 420, 83 P.3d 664, 683 (2004)

 20
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

(citations, brackets omitted).

B. Findings of Facts

 “FOFs are reviewable under the clearly erroneous

standard to determine if the agency decision was clearly

erroneous in view of reliable, probative, and substantial

evidence on the whole record.” Id. at 421, 83 P.3d at 684

(citations, brackets omitted).

C. Conclusions of Law

 “COLs are freely reviewable to determine if the

agency’s decision was in violation of constitutional or statutory

provisions, in excess of statutory authority or jurisdiction of

agency, or affected by other error of law.” Id. (citations,

brackets omitted).

D. Mixed Questions of Law and Fact

 A COL that presents mixed questions of fact and law is
 reviewed under the clearly erroneous standard because the
 conclusion is dependent upon the facts and circumstances of
 the particular case. When mixed questions of law and fact
 are presented, an appellate court must give deference to the
 agency’s expertise and experience in the particular field.
 The court should not substitute its own judgment for that of
 the agency.

Waiâhole I, 94 Hawai#i at 119, 9 P.3d at 431 (citations, brackets

omitted).
 An FOF or a mixed determination of law and fact is clearly
 erroneous when (1) the record lacks substantial evidence to
 support the finding or determination, or (2) despite
 substantial evidence to support the finding or
 determination, the appellate court is left with the definite
 and firm conviction that a mistake has been made.

Id. (citation). “We have defined ‘substantial evidence’ as

 21
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

credible evidence which is of sufficient quality and probative

value to enable a person of reasonable caution to support a

conclusion.” Id. (citation).

E. The State Water Resources Trust

 The public trust in state water resources is a

constitutional doctrine, and as such, “the ultimate authority to

interpret and defend the public trust in Hawai#i rests with the

courts of this state.” Wai#ola, 103 Hawai#i at 421, 83 P.3d at

684.
 This is not to say that this court will supplant its
 judgment for that of the legislature or agency. However, it
 does mean that this court will take a ‘close look’ at the
 action to determine if it complies with the public trust
 doctrine and it will not act merely as a rubber stamp for
 agency or legislative action.

Id. at 422, 83 P.3d at 685.

F. Constitutional Questions

 “We answer questions of constitutional law by

exercising our own independent constitutional judgment based on

the facts of the case. Thus, we review questions of

constitutional law under the right/wrong standard.” State v.

Hanapi, 89 Hawai#i 177, 182, 970 P.2d 485, 490 (1998) (citations

omitted).

 IV. JURISDICTION

 Before the court can consider the parties’ points of

error, it must first resolve a jurisdictional argument. Kernan

v. Tanaka, 75 Haw. 1, 15, 856 P.2d 1207, 1215 (1993) (cert.

 22
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

denied, 510 U.S. 1119 (1994)) (“Appellate courts have an

obligation to insure they have jurisdiction to hear and determine

each case.”) The Commission, HC&S, and WWC argue that Hui/MTF

and OHA do not have a right of appeal, and therefore the court

has no jurisdiction in this matter. Hui/MTF and OHA both contend

that the court’s opinion in Waiâhole I resolves the issue and

clearly establishes that the court has jurisdiction over appeals

of IIFS determinations. As explained below, the court holds that

it has jurisdiction in this case, and takes this opportunity to

elaborate on the jurisdictional analysis from Waiâhole I.

 The water code provides that “[j]udicial review of

rules and orders of the commission under this chapter shall be

governed by chapter 91.” HRS § 174C-12. HRS § 91-14, the

portion of chapter 91 relating to judicial review, states that,

“[a]ny person aggrieved by a final decision and order in a

contested case . . . is entitled to judicial review thereof under

this chapter.” HRS § 91-14(a) (1993). In previous cases

interpreting this provision, the court has defined “contested

case” as “an agency hearing that 1) is required by law and 2)

determines the rights, duties, or privileges of specific

parties.” Pele Defense Fund v. Puna Geothermal Venture, 77

Hawai#i 64, 67-68, 881 P.2d 1210, 1213-14 (1994). Further, the

court determined that a hearing is “required by law” if it is

required by statute, by administrative rule, or by constitutional

 23
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

due process. Id. at 68, 881 P.2d at 1214.

 In this case, neither statute nor administrative rule

mandates a hearing to establish an IIFS. HRS § 174C-7110 governs

the Commission’s actions vis-a-vis the state’s Instream Use

Protection Program, and nothing in that statute requires the

Commission to hold a hearing before establishing or amending an

 10
 HRS § 174C-71, Protection of Instream Uses, provides, in relevant
part, that the Commission shall:

 (2) Establish interim instream flow standards;

 (A) Any person with the proper standing may petition the
 commission to adopt an interim instream flow standard for
 streams in order to protect the public interest pending the
 establishment of a permanent instream flow standard;

 (B) Any interim instream flow standard adopted under this
 section shall terminate upon the establishment of a
 permanent instream flow standard for the stream on which the
 interim standards were adopted;

 (C) A petition to adopt an interim instream flow standard
 under this section shall set forth data and information
 concerning the need to protect and conserve beneficial
 instream uses of water and any other relevant and reasonable
 information required by the commission;

 (D) In considering a petition to adopt an interim instream
 flow standard, the commission shall weigh the importance of
 the present or potential instream values with the importance
 of the present or potential uses of water for noninstream
 purposes, including the economic impact of restricting such
 uses;

 (E) The commission shall grant or reject a petition to adopt
 an interim instream flow standard under this section within
 one hundred eighty days of the date the petition is filed.
 The one hundred eighty days may be extended a maximum of one
 hundred eighty days at the request of the petitioner and
 subject to the approval of the commission;

 (F) Interim instream flow standards may be adopted on a
 stream-by-stream basis or may consist of a general instream
 flow standard applicable to all streams within a specified
 area[.]

 HRS § 174C-71(2) (1993).

 24
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

IIFS. In fact, the code indicates that the Commission need not

hold a hearing; the Code defines the IIFS as “a temporary

instream flow standard of immediate applicability, adopted by the

commission without the necessity of a public hearing, and

terminating upon the establishment of an instream flow standard.”

HRS § 174C-3. The Commission’s administrative rules are

identical to the water code in relevant regard, so there is no

rule-based requirement to hold a hearing.11

 This does not foreclose judicial review of the

Commission’s actions, as there remains a third route whereby a

hearing may be “required by law”: there may be a constitutional

due process requirement. In determining whether a party has a

due process right to an administrative hearing, the court must

first resolve whether the party’s asserted interest is

“‘property’ within the meaning of the due process clauses of the

federal and state constitutions.” Sandy Beach Defense Fund v.

City Council of City and Cnty. of Honolulu, 70 Haw. 361, 376, 773

P.2d 250, 260 (1989) (citing Aguiar v. Hawai#i Housing Auth., 55

Haw. 478, 495, 522 P.2d 1255, 1266 (1974)). “To have a property

interest in a benefit, a person clearly must have more than an

abstract need or desire for it. He must have more than a

 11
 As Hawai#i Administrative Rules § 13-169-2 states, an IIFS is “a
temporary instream flow standard of immediate applicability, adopted by the
commission without the necessity of a public hearing, and terminating upon the
establishment of an instream flow standard.” Haw. Admin. Rules § 13-169-2.

 25
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

unilateral expectation of it. He must, instead, have a

legitimate claim of entitlement to it.” Id. (quoting Bd. of

Regents v. Roth, 408 U.S. 564, 577 (1972)).

 The court has had several opportunities to interpret

due process property interests as affected by the water code. In

the case most similar to the current case, Waiâhole I, this court

considered new and existing WUPA and IIFS for the Waiâhole ditch

system, a water system that provides water from Oahu’s windward

side to the island’s leeward side. Waiâhole I, 94 Hawai#i at

110, 9 P.3d at 422. Waiâhole I contains extensive analysis and

interpretation of the water code, and will be discussed in

subsequent sections of this opinion. Regarding jurisdiction,

however, the opinion provides only brief analysis. First, the

court explained that it had jurisdiction over the appeal of the

existing WUPA because both the HRS and the administrative rules

required a hearing as part of the WUPA process. Waiâhole I, 94

Hawai#i at 119-20 n.15, 9 P.3d at 431-32 n.15. Second, with

regard to the petitions to amend the IIFS and the new WUPA, the

court stated that “constitutional due process mandates a hearing

in both instances because of the individual instream and

offstream ‘rights, duties, and privileges’ at stake.” Id.

(quoting Puna Geothermal, 77 Hawai#i at 68, 881 P.2d at 1214).

 The parties dispute the import of the above-quoted

sentence. Hui/MTF argues that this “holding” from Waiâhole I

 26
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

“made clear that [the court] had independent jurisdiction over

IIFS petitions.” The Commission, HC&S, and WWC argue that the

Waiâhole I court’s citation to Puna Geothermal indicates that the

court had jurisdiction over the IIFS in that case only because

the appeal also challenged the Commission’s resolution of WUPA;

they argue that because no party appealed from the WUPA in the

present case, Waiâhole I is distinguishable and the court,

therefore, lacks jurisdiction.

 First, a review of Puna Geothermal. There, the court

considered whether it had jurisdiction over an appeal following

the Department of Health’s (“DOH”) resolution of Puna Geothermal

Ventures’s (“PGV”) applications for permits to build a well field

and a power plant. 77 Hawai#i at 66, 881 P.2d at 1212. The DOH

held two “public informational hearings,” denied PGV’s request

for a CCH, and ultimately granted PGV’s permit applications. Id.

When the Pele Defense Fund (“PDF”) sought judicial review of the

DOH’s actions, PGV filed a motion to dismiss, arguing that the

court lacked jurisdiction because there had been no contested

case. Id. On appeal, this court concluded that PDF had a

constitutional due process right to a hearing before the DOH.

Id. at 68, 881 P.2d at 1214. The court held,
 as a matter of constitutional due process, an agency hearing
 is also required where the issuance of a permit implicating
 an applicant’s property rights adversely affects the
 constitutionally protected rights of other interested
 persons who have followed the agency’s rules governing
 participation in contested cases.

 27
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Id. (emphasis added). The court concluded that the hearings in

that case satisfied the “contested case” requirement for purposes

of judicial review under HRS § 91-14. Id. at 71, 881 P.2d at

1217.

 The Commission, WWC, and HC&S argue that the Waiâhole I

court’s citation to Puna Geothermal indicates that the court

exercised jurisdiction over the appeal of the IIFS only because

the parties also appealed the Commission’s resolution of permit

applications. Hui/MTF reads Waiâhole I as holding that the court

has independent jurisdiction to review IIFS. The court concludes

that the jurisdictional language from Waiâhole I is susceptible

to both interpretations. However, the court’s due process cases

indicate that the court has jurisdiction to hear Hui/MTF’s appeal

because the IIFS, independent of any WUPA, affects property

interests of Hui/MTF’s members.

 John Duey, President of Hui O Nâ Wai #Ehâ, testified

that the Hui’s members “live, work, and play in the areas of Nâ

Wai #Ehâ,” and that the Hui is “committed to restoring these

streams’ natural and cultural values and protecting Maui’s

quality of life for present and future generations.” #Îao Stream

runs through the property owned by Duey and his wife, Marie

Ho#oululâhui Lindsey Duey. Marie is native Hawaiian; she gave

their property her Hawaiian name: Ho#oululâhui. Ho#oululâhui

 28
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

contains at least seventeen ancient lo#i12, but the Dueys

currently cultivate only two small lo#i with stream water, which

they take directly from, and return to, #Îao Stream. John

testified that he would like to restore the remaining lo#i on his

land, but that “[t]he only limiting factor is the availability of

water.”

 Ron Sturtz, President of the Board of Directors of Maui

Tomorrow Foundation, Inc., submitted a letter stating that the

organization’s supporters engage in traditional and customary

gathering practices. One such supporter, Roselle Keli#ihonipua

Bailey, a kuma hula and native Hawaiian practitioner, submitted

written testimony explaining the gathering practices she would

like to practice in #Îao Stream and its nearshore waters, and

testifying that the lack of flowing water makes her practices

impossible.

 Kalo13 farmer and Hui O Nâ Wai #Ehâ member Hôkûao

Pellegrino testified that his 2.175-acre farm, Noho#ana, contains

several restored ancient lo#i, ready to be cultivated. The

 12
 “Lo#i” is defined as an “[i]rrigated terrace, especially for taro,
but also for rice; paddy.” Pukui & Elbert at 209.

 13
 “Kalo” is the Hawaiian word for taro. Pukui & Elbert at 123. “In
Hawai#i, taro has been the staple from earliest times to the present, and here
its culture developed greatly, including more than 300 forms. All parts of
the plant are eaten, its starchy root principally as poi, and its leaves as
lû#au.” Id.

 29
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Noho#ana lo#i are irrigated via a traditional #auwai14 that diverts

water from Waikapû Stream, and the water that leaves the lo#i

returns to the Stream. Pellegrino testified that he is only able

to cultivate two of his lo#i at a time because of insufficient

water in Waikapû Stream.

 The interests of the Dueys, Roselle Bailey, and Hôkûao

Pellegrino are selected examples of testimony presented to the

Commission, but dozens of others testified about their similar

interests. Indeed, in its FOF/COL D&O, the Commission found that

“Cultural experts and community witnesses provided uncontroverted

testimony regarding limitations on Native Hawaiians’ ability to

exercise traditional and customary rights and practices in the

greater Nâ Wai #Ehâ area due to the lack of freshwater flowing in

Nâ Wai #Ehâ’s streams and into the nearshore marine waters.”

The question before the court today, a question we answer in the

affirmative15, is whether these interests constitute “property

interests” for the purpose of due process analysis.

 The court has explained that a party has a property

interest in the subject of litigation for purposes of due process

analysis if the party has “more than an abstract need or desire

 14
 “#Auwai” means “ditch or canal.” Pukui & Elbert at 33.

 15
 Hui/MTF also has standing to pursue this appeal, having
demonstrated that “their interests were injured” and that they were “involved
in the administrative proceeding that culminated in the unfavorable decision.”
Puna Geothermal, 77 Hawai#i at 69, 881 P.2d at 1215 (quoting Mahuiki v.
Planning Comm’n, 65 Haw. 506, 514-15, 654 P.2d 874, 879-80 (1982)).

 30
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

for it. He must have more than a unilateral expectation of it.

He must, instead, have a legitimate claim of entitlement to it.”

Sandy Beach Defense Fund, 70 Haw. at 376, 773 P.2d at 260. The

court has cited with approval the U.S. Supreme Court’s analysis

that:
 Property interests, of course, are not created by the
 Constitution. Rather they are created and their dimensions
 are defined by existing rules or understandings that stem
 from an independent source such as state law—rules or
 understandings that secure certain benefits and that support
 claims of entitlement to those benefits.

Int’l Broth. of Painters and Allied Trades v. Befitel, 104

Hawai#i 275, 283, 88 P.3d 647, 655 (2004) (quoting Bd. of Regents

v. Roth, 408 U.S. 564, 576 (1972)). See also Aguiar v. Hawai#i

Housing Auth., 55 Haw. 478, 496, 522 P.2d 1255, 1267 (1974)

(citing federal authority to support the conclusion that “a

benefit which one is entitled to receive by statute constitutes a

constitutionally-protected property interest”).

The interests asserted by Hui/MTF have a statutory basis in the

water code. As stated in HRS § 174C-101,
 (c) Traditional and customary rights of ahupua#a tenants who
 are descendants of native Hawaiians who inhabited the
 Hawaiian Islands prior to 1778 shall not be abridged or
 denied by this chapter. Such traditional and customary
 rights shall include, but not be limited to, the cultivation
 or propagation of taro on one's own kuleana and the
 gathering of hihiwai, opae, o‘opu, limu, thatch, ti leaf,
 aho cord, and medicinal plants for subsistence, cultural,
 and religious purposes.

 (d) The appurtenant water rights of kuleana and taro lands,
 along with those traditional and customary rights assured in
 this section, shall not be diminished or extinguished by a
 failure to apply for or to receive a permit under this
 chapter.

 31
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

HRS §§ 174C-101(c) and (d) (1993). HRS § 174C-63 is yet another

section of the water code that entitles native Hawaiian farmers

to their water; it states: “Appurtenant rights are preserved.

Nothing in this part shall be construed to deny the exercise of

an appurtenant right by the holder thereof at any time.” HRS §

174C-63 (1993).

 HC&S argues that these interests do not rise to the

level of property for due process purposes, citing Sandy Beach

Defense Fund, for support that native Hawaiian practices are

similar to “aesthetic and environmental interests” which the

court has held to be insufficient to establish a property

interest. In that case, the City and County of Honolulu issued

Special Management Area (“SMA”) use permits for a proposed

development. 70 Haw. at 364, 773 P.2d at 253. Area residents

and community groups alleged that the County was required to hold

a CCH before issuing the permits, expressing concerns “regarding

the development’s impact on coastal views, preservation of open

space, traffic, potential flooding, and sewage treatment.” Id.

The supreme court held that the community groups were not

entitled to a CCH because their “aesthetic and environmental”

claims did not constitute “legitimate claims of entitlement.”

Id. at 376, 773 P.2d at 260. The court also noted that the

community groups did not cite authorities to support their

argument, and that none of the area residents owned property

 32
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

contiguous to the development. Id. at 377, 773 P.2d at 261.

Sandy Beach is readily distinguishable. First, the affected

parties before the court today own or reside on land in the area

of Nâ Wai #Ehâ, and rely upon that water to exercise traditional

and customary rights, including kalo farming. Second, as cited

above, there is statutory authority found throughout the water

code to support their entitlement to water for kalo farming.

 HC&S also argues that downstream kalo farmers cannot

assert property interests to more water than they currently use

because it “would be a grave departure from the principle that

‘the range of interests protected by procedural due process is

not infinite.’” (quoting Int’l Bd. of Painters & Allied Trades v.

Befitel, 104 Hawai#i at 283, 88 P.3d at 655). This argument is

rejected for several reasons. First, as both Hui/MTF and OHA

argue, the fact that HC&S and WWC have historically deprived

downstream users of water does not negate those downstream users’

interest in the water. Second, neither statute quoted above

provides for abandonment of appurtenant rights; in fact, the text

specifically protects against abandonment by stating that

appurtenant rights will “not be diminished or extinguished by a

failure to apply for or to receive a permit.” HRS § 174C-101(d).

Furthermore, as the court explained in Waiâhole I, “The

constitution and Code, [. . .] do not differentiate among

‘protecting,’ ‘enhancing,’ and ‘restoring’ public instream values

 33
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

[like native Hawaiian rights], or between preventing and undoing

‘harm’ thereto.” 94 Hawai#i at 150, 9 P.3d at 462.

 The court also disagrees with the Commission’s, WWC’s,

and HC&S’s argument that setting the IIFS in this case did not

determine individual water rights. When the Commission issued a

D&O retaining the existing IIFS for #Îao and Waikapû Streams, it

necessarily affected the Dueys’ and Pellegrino’s access to water

because it endorsed the upstream diversions that remove water

from #Îao and Waikapû Streams, apparently finding that the

“importance” of those diversions outweighed the importance of

downstream uses. HRS § 174C-71(2)(D).

 Though the conclusions above are sufficient to support

today’s holding, the analysis of one more case merits

consideration. In Ko#olau Agr. Co., Ltd. v. Comm’n On Water Use

Mgmt. (“Ko#olau Ag”), an agriculture company unsuccessfully

sought review of the Commission’s designation of several O#ahu

aquifers as Water Management Areas (“WMA”). 83 Hawai#i 484, 486,

927 P.2d 1367, 1369 (1996). The court explained that the company

did not have a property interest in whether the aquifers in

question received the WMA designation. Id. at 493, 927 P.2d at

1376. In so concluding, the court drew a distinction between WMA

designations, which do not require a hearing, and WUPA decisions,

which do require hearings. As the court explained, this

disparity in procedure is “eminently logical given the difference

 34
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

between the issues presented for decision.” Id. First, the

court noted the difference in analysis required before the two

resolutions. When considering a WMA designation, the Commission

must determine whether “the water resources in the area may be

threatened by existing or proposed withdrawals or diversions of

water.” Id. (quoting HRS § 174C-41(a)). Contrast a WUPA, where

the Commission’s analysis is much more robust; the Commission

must consider several factors when granting a WUPA, including

whether the water use is “a reasonable-beneficial use as defined

in [the Code];” whether the use is “consistent with the public

interest;” and whether it is consistent with governmental land

use plans. Id. at 492, 927 P.2d at 1375 (quoting HRS § 174C-48).

Second, the court considered the necessity of judicial review.

The court recognized that “the consequences of an erroneous [WMA]

designation decision by the Commission do not indicate a need for

judicial review because the rights of individual water users are

fully protected in the permitting process.” Id. at 493, 927 P.2d

at 1376. And third, the court noted that WMA designations do not

affect the interests of any potential water users; the impact of

such a designation is only that the user’s water source is

subject to the Commission’s regulation, which does not, in and of

itself, affect the user’s water rights. Id. Contrast a WUPA,

where the outcome is a permit directly specifying a user’s rights

to water. Id.

 35
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 All parties cite Ko#olau Ag for assistance on the

question of whether there is a property interest at stake in this

case. The Commission, HC&S, and WWC argue that an IIFS

determination is similar to designating a WMA because neither

directly determines property rights. The court concludes that

each of the factors listed above counsel in favor of judicial

review in this case. First, the analysis the Commission must

undertake in setting an IIFS is complicated. The statute

specifies the factors the Commission must consider:
 In considering a petition to adopt an interim instream flow
 standard, the commission shall weigh the importance of the
 present or potential instream values with the importance of
 the present or potential uses of water for noninstream
 purposes, including the economic impact of restricting such
 uses.

HRS § 174C-71(2)(D). As the voluminous record in this case

readily establishes, each of these factors is complex and

involves significant and thorough analysis and factfinding.

Unlike establishing a WMA, the analysis supporting a

determination of an IIFS requires more than a yes/no decision,

but rather requires the Commission to weigh serious and

significant concerns, including: “the need to protect and

conserve beneficial instream uses of water,” “the importance of

the present or potential instream values,” “the importance of the

present or potential uses of water for noninstream purposes,” and

“the economic impact of restricting such uses.” HRS §

174C-71(2)(C) and (D). Indeed, in Waiâhole I, the Commission

 36
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

itself advocated for due process rights in proceedings to

determine IIFS. One of the Commission’s own Orders, cited in the

court’s opinion with approval, states
 A petition to modify instream flows at ... specific
 locations is a fact-intensive, individualized determination
 at each site that may directly affect downstream and
 off-stream interests.... [I]ndividual claims may need to be
 examined. The site-specific inquiry required in this case is
 not compatible with rule making, but with a method which
 provides the due process procedures necessary to assess
 individual interests.

94 Hawai#i at 152, 9 P.3d at 464.

 Second, the ramifications of an erroneous IIFS could

offend the public trust, and is simply too important to deprive

parties of due process and judicial review. As the court stated

in Waiâhole I, “[t]he public trust . . . is a state

constitutional doctrine. As with other state constitutional

guarantees, the ultimate authority to interpret and defend the

public trust in Hawai#i rests with the courts of this state.” 94

Hawai#i at 143, 9 P.3d at 455. The courts serve an important

function with regard to the water code; as the court noted in

Waiâhole I, “[t]he check and balance of judicial review provides

a level of protection against improvident dissipation of an

irreplaceable res.” Id. (quoting Arizona Cent. for Law in Pub.

Interest v. Hassell, 837 P.2d 158, 168–69 (Ariz. Ct. App. 1991),

review dismissed, 837 P.2d 158 (Ariz. 1992) (brackets and

citation omitted)).

 Finally, in Ko#olau Ag, the court specified that there

 37
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

was little necessity for judicial review because the permitting

process would adequately protect individual rights. 83 Hawai#i

at 493, 927 P.2d at 1376. This protection does not exist in

today’s case for several reasons. First, as the Commission

itself acknowledges, setting an IIFS is a final action and it

would be “inappropriate for the Commission to reevaluate the IIFS

during the upcoming surface water use permit proceedings.” This

argument indicates that downstream users cannot ask the

Commission to raise the IIFS to a level that would accommodate a

permit to fulfill their kuleana needs. Second, as the court

noted in Waiâhole I, the water code envisions that “Once the

Commission translates the public interest in instream flows into

‘a certain and manageable quantity[, t]he reference to

consistency with the public interest in the definition of

reasonable beneficial use likewise becomes a reference to that

quantity.’” 94 Hawai#i at 149, 9 P.3d at 461 (quoting Douglas W.

MacDougal, Private Hopes and Public Values in the “Reasonable

Beneficial Use” of Hawai#i’s Water: Is Balance Possible?, 18 U.

Haw. L. Rev. 1, 62 (1996)). In short, the IIFS matter. They

have both immediate and lasting impacts on individual water

users. They are also an opportunity for the Commission to

consider the needs of our state’s water systems. “Under the

[Water] Code, [. . .] instream flow standards serve as the

primary mechanism by which the Commission is to discharge its

 38
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

duty to protect and promote the entire range of public trust

purposes dependent upon instream flows.” 94 Hawai#i at 148, 9

P.3d at 460. The court therefore holds that Hui/MTF had a due

process right to a hearing, and therefore has a right to judicial

review, in this case.

 V. ANALYSIS OF POINTS OF ERROR

A. This Court Must Dismiss MDWS’s Cross-Appeal, As It Seeks
 Resolution of an Abstract Proposition of Law.

 MDWS filed a cross-appeal in this case seeking

“clarification” of several COL, in which the Commission

articulated that it established the IIFS prior to considering

noninstream uses, including MDWS’s diversions for the public

water supply. MDWS contends that Waiâhole I established a

“higher status” for public trust uses as compared to commercial

noninstream uses, and that municipal use, though a noninstream

use, should be afforded higher status and preferential

consideration as a public trust use.

 Hui/MTF filed an answering brief to MDWS’s opening

brief; OHA joined the brief. In its answering brief, Hui/MTF

argues that MDWS’s point of error is not reviewable by the court

because MDWS seeks clarification of language in the Commission’s

D&O but does not argue that the Commission’s alleged error

affected MDWS’s rights or interests. Hui/MTF reasons that

because MDWS sought and was issued water use permits in the

 39
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

amounts requested, any treatment of their point of error would be

an “advisory opinion.” Hui/MTF accordingly requests that the

court dismiss MDWS’s cross-appeal.

 Hui/MTF’s argument is well-taken. This court has

recently affirmed its practice not to issue “advisory opinions on

abstract propositions of law.” Kemp v. State of Hawai#i Child

Support Enforcement Agency, 111 Hawai#i 367, 385, 141 P.3d 1014,

1032 (2006)) (citing Kona Old Hawaiian Trails Group v. Lyman, 69

Haw. 81, 87, 734 P.2d 161, 165 (1987)). This is a longstanding

value of the court.
 The duty of this court, as of every other judicial tribunal,
 is to decide actual controversies by a judgment which can be
 carried into effect, and not to give opinions upon moot
 questions or abstract propositions, or to declare principles
 or rules of law which cannot affect the matter in issue in
 the case before it.

Wong v. Bd. of Regents, 62 Haw. 391, 394-95, 616 P.2d 201, 204

(1980) (citing Anderson v. Rawley Co., 27 Haw. 150, 152 (1923))

(further citations omitted).

 MDWS’s point of error seeks resolution of an abstract

proposition because any possible resolution of MDWS’s point of

error would not affect MDWS’s right—or any other party’s right—to

the water use permits issued by the Commission. MDWS sought

permits for 1.042 mgd for the Kepaniwai Well (Well No. 5332-05),

and 1.359 mgd for the #Îao Tunnel (Well No. 5332-02). The

Commission found that MDWS’s applications met all the permitting

criteria and awarded the permits in full. Analysis of MDWS’s

 40
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

point of error would not affect this determination because MDWS’s

request was granted, even without the requested treatment as a

public trust use. MDWS’s cross-appeal is therefore dismissed.

B. The Commission Failed To Enter Findings of Fact and
 Conclusions of Law Regarding The Effect Of Its Amended IIFS
 On Traditional And Customary Native Hawaiian Practices.

 OHA and Hui/MTF argue that the IIFS established by the

Commission did not protect traditional and customary native

Hawaiian rights to the extent feasible. More specifically, both

parties contend that the Commission erred in failing to

articulate FOF and COL regarding the impact of its decision on

traditional and customary native Hawaiian rights. OHA also

argues that the Commission failed to weigh traditional and

customary rights when it balanced instream values and noninstream

uses.

 The Commission articulated a general conclusion of law

relevant to this point of error:
 19. In addition to appurtenant rights when practiced for
 subsistence, cultural and religious purposes, traditional
 and customary rights include, but are not limited to,
 kuleana water for domestic purposes, kalo cultivation, and
 other irrigation purposes, and the gathering of hihiwai,
 opae, o#opu, limu, thatch, ti leaf, aho cord, and medicinal
 plants for subsistence, cultural, and religious purposes.

COL 19 is, in large part, a quotation from HRS § 174C-101(c), the

provision in the water code protecting native Hawaiian rights; it

provides an illustrative list of the activities that can be

protected under the water code. During the hearing, Hui/MTF and

 41
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

OHA presented several witnesses who testified about native

Hawaiian practices specific to Nâ Wai #Ehâ, and the Commission

found several facts on the subject. First, as for historical

practices, the Commission found several facts indicating a

distinct connection between Nâ Wai #Ehâ and Hawaiian history and

culture. The Commission found:
 34. Due to the profusion of fresh-flowing water in ancient
 times, Nâ Wai #Ehâ supported one of the largest populations
 and was considered the most abundant area on Maui; it also
 figured centrally in Hawaiian history and culture in
 general.

 35. The abundance of water in Nâ Wai #Ehâ enabled extensive
 lo#i kalo (wetland kalo) complexes, including varieties
 favored for poi-making such as “throat-moistening lehua
 poi.”

 [. . .]

 40. In addition to extensive agricultural production,
 traditional and customary practices thrived in Nâ Wai #Ehâ,
 including the gathering of upland resources, such as thatch
 and ti, and protein sources from the streams, including
 #o#opu, #ôpae, and hihiwai.

 [. . .]

 43. The waters of Nâ Wai #Ehâ were renowned for the
 traditional and customary practice of hiding the piko, or
 the naval cord of newborn babies. “[T]he spring Eleile
 contained an underwater cave where the people of the area
 would hide the piko (umbilical cords) of their babies after
 birth. . . . The location of where one buries or hides the
 piko is a traditional custom that represents Native Hawaiian
 cultural beliefs about an individual’s connection to the
 land.”

 44. Upper #Îao Valley contained the royal residences of
 chiefs in both life and the afterlife. In a secret
 underwater cave, Native Hawaiians hid the bones of “all the
 ruling chiefs who had mana and strength, and the kupua, and
 all those attached to the ruling chiefs who were famous for
 their marvelous achievements. There were several hundred in
 all who were buried there.” Thus, the burial of sacred
 chiefs required a deep freshwater body to ensure the utmost
 protection of their bones.

 45. Nâ Wai #Ehâ is home to several important heiau. Of
 particular significance are Haleki#i and Pihana Heiau,

 42
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 located between Waiehu and #Îao Streams. These heiau were
 re-consecrated in 1776 as an offering before the famous
 battle between Hawai#i and Maui. It is said that
 Kalanikaukooluaole, a high chiefess and daughter of
 Kamehamehanui, bathed in the stream water near the heiau,
 before she entered the heiau.

 [. . .]

 54. The spiritual practice of hi#uwai, also known as kapu
 kai, often occurred around the time of makahiki, when
 individuals “would go into the rivers or into the ocean in
 order to do a cleansing for the new year[.]” This type of
 cleansing, which required immersion in the water, was also
 conducted “before you start or end certain ceremonies[.]”
 For ceremonies dedicated to Kâne, “having a hi#uwai in a
 stream magnifies the mana[.]”

 The Commission heard testimony explaining that native

Hawaiian practices still continue in Nâ Wai #Ehâ:
 51. Despite significant challenges, some Native Hawaiian
 practitioners in Nâ Wai #Ehâ continue to exercise
 traditional and customary rights and practices, including
 “gathering stream life such as hihiwai, #ôpae, #o#opu, and
 limu for subsistence and medicinal purposes,” as well as
 “cultivating taro for religious and ceremonial uses,
 gathering materials for hula, lua (ancient Hawaiian martial
 arts), and art forms.”

 [. . .]

 53. Kumu hula Akoni Akana gathers materials such as hau,
 palapalai, la#î, and laua#e from Waihe#e and Waiehu for hula
 ceremonies and performances. “As part of the protocol for
 gathering these items, we always soak the leaves we gather
 in the stream flow nearby. This practice necessitates a
 flowing stream.”

 [. . .]

 55. Other practitioners would like to expand the scope of
 their traditional and customary practices and plan to do so
 if water is returned to the streams. For example, Hôkûlani
 Holt-Padilla testified that “[m]any families seek to
 reestablish the tradition of growing kalo” in Nâ Wai #Ehâ.

 The Commission also found facts to explain the

connection between current traditional and customary practices

and streamflow levels:
 49. Cultural experts and community witnesses provided

 43
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 uncontroverted testimony regarding limitations on Native
 Hawaiians’ ability to exercise traditional and customary
 rights and practices in the greater Nâ Wai #Ehâ area due to
 the lack of freshwater flowing in Nâ Wai #Ehâ’s streams and
 into the nearshore marine waters.

 50. “#O#opu must once have been plentiful in Nâ Wai #Ehâ
 streams; the wind in Waihe#e is called ka makani kili#o#opu,
 which means the wind that brings the faint odors of the
 #o#opu.” Today, however, “[i]t is very difficult to find
 #ôpae, hihiwai, and #o#opu in the streams of Nâ Wai #Ehâ,
 large portions of which are frequently dry.”

 [. . .]

 57. According to testimony, “Nâ Wai #Ehâ continues to hold
 the potential to once again support enhanced traditional and
 customary rights and practices if sufficient water is
 restored.” Restoring streamflow to Nâ Wai #Ehâ “would
 enormously benefit” Native Hawaiians and other communities
 who seek to reconnect with their culture and live a self-
 sustaining lifestyle, and more people would be able to
 engage in traditional and customary practices with more
 water.

 58. Testimony contended that “Restoration of mauka to makai
 flow to the streams is critical to the perpetuation and
 practice of Hawaiian culture in Nâ Wai #Ehâ.” “If we are not
 able to maintain our connection to the land and water and
 teach future generations our cultural traditions, we lose
 who we are as a people.”

 59. According to testimony, “The return of the waters of Nâ
 Wai #Ehâ to levels that can sustain the rights of native
 Hawaiians and Hawaiians to practice their culture will
 result in the betterment of the conditions of native
 Hawaiians and Hawaiians by restoring spiritual well-being
 and a state of ‘pono’ (goodness, righteousness, balance) to
 the people and communities of Nâ Wai #Ehâ.”

 60. Testimony contended that cold, free-flowing water is
 essential for kalo cultivation, which in turn is integral to
 the well-being, sustenance, and cultural and religious
 practices of native Hawaiians and Hawaiians. Kalo
 cultivation provides not only a source of food, but also
 spiritual sustenance, promotes community awareness and a
 connection to the land, and supports physical fitness and
 mental well-being.

 OHA and Hui/MTF both argue that the Commission had a

duty to make specific findings of fact and conclusions of law

with regard to the effect of its D&O on traditional and customary

native Hawaiian practices. Their argument is grounded in Ka

 44
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Pa#akai O Ka #Aina v. Land Use Comm’n, 94 Hawai#i 31, 7 P.3d 1068

(2000).

 In Ka Pa#akai O Ka #Aina, native Hawaiian groups

appealed the State Land Use Commission’s (“LUC”) grant of a land

developer’s petition to reclassify land in a conservation

district to an urban district. 94 Hawai#i at 33, 7 P.3d at 1070.

The LUC held hearings on the petition, and reached several

findings of fact and conclusions of law regarding native Hawaiian

practices. Id. at 36-37, 7 P.3d at 1073-74. The LUC determined

that the developer would develop and implement a Resource

Management Plan (“RMP”) to coordinate coastal access for the

purpose of traditional and customary practices; the LUC

specifically found that one family gathered salt in the area, and

that the shoreline is used for fishing, gathering limu, #opihi,

and other resources. Id. at 37, 7 P.3d at 1074. The LUC

mandated that the RMP will preserve these practices,

archaeological sites and the coastal trail, and required the

developer to preserve and protect native Hawaiian rights. Id. at

38, 39, 7 P.3d at 1075, 1076. On appeal, this court recognized

that Article XII, section 7 of the state constitution “places an

affirmative duty on the State and its agencies to preserve and

protect traditional and customary native Hawaiian rights,” while

giving the State and its agencies the power to discharge this

duty. Id. at 45, 7 P.3d at 1082. The court then provided an

 45
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

“analytical framework” to guide the State in its decisions

affecting native Hawaiian rights, specifying that the agency

must, at a minimum, articulate:
 (1) the identity and scope of “valued cultural, historical,
 or natural resources” in the petition area, including the
 extent to which traditional and customary native Hawaiian
 rights are exercised in the petition area; (2) the extent to
 which those resources-including traditional and customary
 native Hawaiian rights-will be affected or impaired by the
 proposed action; and (3) the feasible action, if any, to be
 taken by the LUC to reasonably protect native Hawaiian
 rights if they are found to exist.

Id. at 46-47, 7 P.3d at 1083-84 (internal footnotes omitted).

The court held that the LUC failed to satisfy those criteria for

several reasons: (1) the LUC did not enter definitive findings

regarding the extent of the native Hawaiian practices, but rather

delegated the determination to the developer; (2) the LUC did not

enter findings about the practices undertaken outside the RMP,

despite evidence that the area outside the RMP could require

protection; (3) “the LUC made no specific findings or conclusions

regarding the effects on or the impairment of any Article XII,

section 7 uses, or the feasibility of the protection of those

uses.” Id. at 48-49, 7 P.3d at 1085-86 (emphasis in original).

As the court explained, “the promise of preserving and protecting

customary and traditional rights would be illusory absent

findings on the extent of their exercise, their impairment, and

the feasibility of their protection.” Id. at 50, 7 P.3d at 1087.

 Hui/MTF and OHA argue that the Commission’s FOF/COL D&O

do not satisfy the analytical framework of Ka Pa#akai O Ka #Aina.

 46
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

They cite the Commission’s own findings that the lack of

freshwater in Nâ Wai #Ehâ limits the native Hawaiian practices of

kalo cultivation and gathering, and argue that the Commission did

not fulfill its duty to protect native Hawaiian rights because

“nothing in the Decision indicates that the majority even

considered the feasibility of protecting those traditional and

customary rights.”

 The court concludes that Hui/MTF and OHA are correct;

the Commission’s FOF/COL D&O, while very thorough in several

respects, including its documentation of the area’s native

Hawaiian practices, lacks findings or conclusions articulating

the effect of the amended IIFS on the native Hawaiian practices

of Nâ Wai #Ehâ. It also lacks findings or conclusions explaining

the feasibility of protecting the practices. This is

particularly apparent with regard to kalo cultivation,

considering the Commission’s decision not to restore any

streamflow to #Îao and Waikapû Streams. In its FOF/COL D&O, the

Commission identified seventeen kuleana ditch/pipe systems, and

divided those seventeen into two categories: the fourteen that

are connected to one of the primary distribution systems (and

thus rely on diverted water for their kalo cultivation), and the

three that divert water directly from a stream (and thus rely on

sufficient instream flows from which to pull their water). While

the Commission’s analysis considered the needs of the former

 47
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

category of kuleana users, there was no mention of the kuleana

users who access their water directly from the streams. This is

particularly troublesome for the users who take from two of the

ditches, described in the record as the Pellegrino and Duey

Kuleana Ditches, which draw water directly from Waikapû and #Îao

Streams, respectively. The users on those Ditches testified that

their water is insufficient, and urged the Commission to amend

upward the IIFS for their streams so they could irrigate their

lo#i kalo. The Commission’s FOF/COL D&O justifies its decision

not to restrict diversions from Waikapû and #Îao Streams due to

the streams’ lack of potential to support certain native species,

described as amphidromous.16 The Commission does not state the

effect of this decision, which is to deny the Pellegrino and Duey

Ditch users the water they need to cultivate the lo#i kalo on

their property; furthermore, the Commission did not articulate

whether it would be feasible to return flow sufficient to support

the kuleana.

 In addition to neglecting this portion of the kalo

cultivation analysis, the FOF/COL D&O does not provide any

analysis of the decision’s effect on gathering rights. HC&S

argues that the Commission’s FOF/COL were adequate on this point,

reasoning that “if instream fauna populations increase as a

 16
 A full discussion of this analysis follows in Section V.C.1.

 48
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

result of the amended IIFS as [the Commission] anticipates they

will, that would support gathering practices.” This argument

fails for two main reasons. First, the FOF/COL do not satisfy

the analytical framework articulated in Ka Pa#akai O Ka #Aina. It

appears as though the first step of analysis, identification of

the scope of traditional and customary native Hawaiian rights, is

satisfied by the above-quoted FOF regarding gathering rights,

which identify the several items gathered from Nâ Wai #Ehâ.

However, subsequent steps of the analysis require the

administrative agency to articulate “the extent to which those

resources [. . .] will be affected or impaired by the proposed

action,” and then to specify what feasible action can be taken to

protect native Hawaiian rights. Ka Pa#akai O Ka #Aina, 94 Hawai#i

at 47, 7 P.3d at 1084. The FOF/COL do not contain any

information on these two steps of analysis. Furthermore, even if

the court accepted HC&S’s post hoc explanation to be adequate,

this would only resolve rights to gather amphidromous species,

but the Commission concluded that gathering rights in Nâ Wai #Ehâ

also encompassed several other species. The Commission’s

analysis does not examine whether the amended IIFS impact these

gathering rights, or whether any negative impact may be avoided.

 Having concluded that the Commission did not discharge

its duty with regard to the feasibility of protecting native

Hawaiian rights, the court must vacate the Commission’s FOF/COL

 49
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

D&O and remand to the Commission for further consideration of the

effect the IIFS will have on native Hawaiian practices, as well

as the feasibility of protecting the practices. Should the

Commission determine that the amended IIFS will negatively impact

protected native Hawaiian practices and that protection of those

practices is feasible, the Commission may enter amended IIFS to

reflect that protection.

C. The Commission’s D&O Does Not Adequately Justify Its
 Decision Not To Restore Streamflow To The #Îao And Waikapû
 Streams.

 Hui/MTF challenges the Commission’s failure to restore

flow to the #Îao and Waikapû Streams. Hui/MTF argues that such

an action was not supported by the record and disregards all

instream uses other than sustaining amphidromous species.

Hui/MTF further contends that the Commission did not properly

weigh the competing interests in this case, and that the

Commission arbitrarily misused the USGS’s temporary flow release

figures.

 1. The Commission’s Analysis Regarding Instream Use Is
 Incomplete.

 The Commission explained its reasoning in the FOF/COL

D&O section titled “The Commission’s Analysis and Conclusions.”

That section of analysis shows a clear emphasis placed on the

potential to restore amphidromous species in the streams. This

was a main area of controversy in the hearing; the parties

 50
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

presented the Commission with several expert witnesses, all

promoting different opinions on the issue.

 The term “amphidromous” describes species of fish that

undergo regular, obligatory migration between fresh water and the

sea at some stage in their life cycle other than the breeding

period. Native Hawaiian amphidromous species exhibit “freshwater

amphidromy,” where spawning takes place in fresh water, and the

newly hatched larvae are swept into the sea by stream currents.

While in the sea, the larvae undergo development as zooplankton

before returning to fresh water to grow to maturity. The

Commission found that these species suffer in Nâ Wai #Ehâ due to

the disruption of natural flow caused by the offstream water

diversions; the diversions degrade or destroy habitat, diminish

food sources, diminish larval drift by capturing eggs and larvae,

and impair flows necessary to transport larvae to the ocean.

The Commission also found that discharge of sufficient duration

and volume is necessary to attract and accommodate upstream

migration of post-larval fish, mollusks, and crustaceans; there

is a direct correlation between stream volume and recruitment,

such that increased streamflow correlates with increased

recruitment at the stream mouth.

 Dr. Mark Eric Benbow, an Assistant Professor at

Michigan State University, testified on behalf of Hui/MTF as an

expert in aquatic biology, ecology, and the Central Maui streams.

 51
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Dr. Benbow testified that the amphidromous life cycle requires

continuous mauka-to-makai flow, though he acknowledged that he

did not know the precise volume and duration necessary to sustain

the species. Dr. Benbow reached his opinions after conducting

multi-year studies of Central Maui streams in which he found that

the largest migrations of species occur in streams with minimal

or no diversions, while the greatest reductions in recruitment

during drought occur in diverted streams. Dr. Benbow made two

specific recommendations to the Commission: first, he recommended

that the Commission require sufficient flow levels to increase

the quantity and quality of habitat in order to have a

functioning reproduction population of organisms; second, he

recommended maintaining continuous mauka-to-makai flow in Nâ Wai

#Ehâ. Dr. Benbow testified that, without additional studies, he

cannot recommend maintaining the streams at less than 75 percent

of their median flow. As the Commission found, however, Benbow’s

75-percent figure was an “informed guess,” and the precise volume

and duration of streamflow needed to sustain the life cycle of

amphidromous organisms is not known.

 John Ford, Program Director and Office Lead for SWCA

Environmental Consultants, testified on behalf of HC&S as an

expert in aquatic biology, with specific emphasis on native

species in Hawaiian streams. Ford presented a different account

of the importance of mauka-to-makai flow for amphidromous

 52
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

species. Ford distinguished “ecological connectivity” from

“physical connectivity”; the former is the term for streamflows

sufficient to allow the normal distribution of a species within

an entire watershed, the latter is the term for continuous flow

from a specific stream’s headwaters to its mouth. Ford noted

that there are naturally interrupted and intermittent streams in

Hawai#i with amphidromous organism populations, and suggested

that amphidromous species therefore may not require the

continuous physical connectivity of each stream to sustain their

population.

 HC&S retained Ford’s consulting company, SWCA, to

evaluate amphidromous species in Nâ Wai #Ehâ. In 2007 and early

2008, SWCA performed a series of larval drift sampling to

evaluate the reproduction of amphidromous species; this survey

lasted one week in total, so the Commission found it was “just a

snapshot” and could not support “broad extrapolations over time”

or “to other streams.” SWCA observed that Waihe#e River was the

only stream in Nâ Wai #Ehâ with significant reproductive

populations of native amphidromous species. SWCA also observed

amphidromous species in Waikapû and #Îao Streams, which may be

evidence of ecological connectivity as those streams do not have

physical connectivity to the sea except during prolonged intense

flooding events. There may be another explanation, however, as

Dr. Benbow testified that he and Division of Aquatic Resources

 53
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

biologist Skippy Hau have planted specimens of amphidromous

species above the diversions of those streams. SWCA concluded

that ecological connectivity exists under diverted conditions in

the Waihe#e River and Waiehu Stream. Ford opined that the

addition of flow to Waihe#e River and Waiehu Stream would be the

most beneficial for increasing populations of native amphidromous

species in Nâ Wai #Ehâ. With regard to #Îao Stream, SWCA’s final

conclusion was that the channelization “is the primary factor”

impeding recruitment of amphidromous species. SWCA also found no

definitive evidence that Waikapû Stream ever flowed continuously

from mauka to makai.

 The Commission’s Final FOF/COL D&O accepted Ford’s view

of the streams with regard to amphidromous species. As the

Commission explained in its final analysis section, it
 concluded that the restorative potentials are highest for
 Waihe#e River and Waiehu Stream. #Îao Stream can be restored
 to enhance recruitment and increase stream life, but its
 reproductive potential is severely limited because of
 extensive channelization in the 2.5 miles immediately above
 its mouth. Waikapû Stream likely has minimal to no
 reproductive potential, because there probably was no
 pre-diversion continuous flow to the mouth, and even if
 there had been continuous flow, Kealia Pond and the delta
 below most likely inhibited recruitment.

Hui/MTF argues that the Commission’s treatment of #Îao and

Waikapû Streams is not supported by the record and disregards all

instream uses other than amphidromous species.

 In setting the IIFS, the Commission was charged with

weighing “present or potential instream values.” HRS § 174C-

 54
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

71(2)(D). The water code contains a definition of instream uses,

as well as an illustrative list of examples. It provides:
 “Instream use” means beneficial uses of stream water for
 significant purposes which are located in the stream and
 which are achieved by leaving the water in the stream.
 Instream uses include, but are not limited to:

 (1) Maintenance of fish and wildlife habitats;

 (2) Outdoor recreational activities;

 (3) Maintenance of ecosystems such as estuaries,
 wetlands, and stream vegetation;

 (4) Aesthetic values such as waterfalls and scenic
 waterways;

 (5) Navigation;

 (6) Instream hydropower generation;

 (7) Maintenance of water quality;

 (8) The conveyance of irrigation and domestic water
 supplies to downstream points of diversion; and

 (9) The protection of traditional and customary
 Hawaiian rights.

HRS § 174C-3. As Hui/MTF shows, the record contains substantial

evidence that establishing mauka-to-makai flow in all of the

streams of Nâ Wai #Ehâ would support the public interest by

fostering many of the statutorily-designated instream uses.

Hui/MTF argues that the Commission focused on amphidromous

species, a subset of parenthesis (1) in the statute, and

disregarded evidence supporting the other instream uses.

 HC&S replies that the Commission is not required to

restore streamflow, or even to establish an IIFS, for each

stream. The water code requires the Commission to establish IIFS

in some instances; as the code provides, the Commission “shall”

 55
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

set an IIFS “in order to protect the public interest”. HRS §

174C-71(2)(A). Accordingly, in resolving the petition to amend

the IIFS for Nâ Wai #Ehâ, the Commission was not precluded from

retaining the existing IIFS in some or all of the streams, had it

concluded that the public interest was sufficiently protected by

the existing IIFS.

 In undertaking a close review of the Commission’s

decision, it is apparent that the decision focuses on the flow

standards as they relate to amphidromous species, and justifies

the decision not to restore water to #Îao and Waikapû Streams due

to the conclusion that those streams show limited “reproductive

potential” for amphidromous species. HC&S, the Commission, and

WWC draw the court’s attention to the evidence in the record,

especially the SWCA evaluation reviewed supra, that supports the

Commission’s conclusion. However, Hui/MTF’s point of error does

not merely contend that the Commission’s decision is not

supported by the record; it also alleges that the Commission

erred in disregarding the evidence of other instream uses. In

Waiâhole I, this court held that where “the record demonstrates

considerable conflict or uncertainty in the evidence, the agency

must articulate its factual analysis with reasonable clarity,

giving some reason for discounting the evidence rejected.”

Waiâhole I, 94 Hawai#i at 163-64, 9 P.3d at 475-76. In its

FOF/COL D&O, the Commission does not explain its focus on

 56
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

amphidromous species above the evidence of other instream uses.

Even if the #Îao and Waikapû Streams may not support amphidromous

species, evidence that they can support other instream uses must

be weighed against noninstream uses, as required by HRS § 174C-

71(2)(D). The Commission erred in not considering this evidence;

on remand, the Commission must undertake and articulate this

analysis. Waiâhole I, 94 Hawai#i at 158, 9 P.3d at 470

(remanding where the Commission “made invalid, inadequate, or

incomplete findings.”) (citation).

 2. The Commission Did Not Err In Using USGS Data As A
 Starting Point For Analysis.

 In federal fiscal year 2006, the USGS initiated a study

of Nâ Wai #Ehâ. The study consisted of eight parts: (1)

compiling and analyzing existing information relevant to the

Waihe#e River, and Waiehu, #Îao, and Waikapû Streams, (2)

conducting baseline reconnaissance surveys of the streams to

identify sites of diversion and return flow and significant

gaining and losing reaches, (3) establishing low-flow partial-

record stations in reaches with flowing water to characterize

natural and current diverted flows in Nâ Wai #Ehâ streams, (4)

establishing temperature-monitoring sites in reaches with flowing

water to provide information on temperature variations for

diverted and undiverted conditions, (5) monitoring the frequency

of dry days in selected reaches of the diverted streams to

 57
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

establish the number of days during which continuous mauka-to-

makai flow is available for the upstream movement of native

species, (6) surveying the presence or absence of native and non-

native aquatic species in selected stream reaches to provide

baseline data for assessing effects of streamflow restoration,

(7) collecting macrohabitat, microhabitat, and channel-geometry

information in selected study reaches downstream from existing

diversions to characterize the effects of diversions on habitat

for native stream macrofauna, and (8) analyzing data and

producing a report summarizing the study findings.

 Photographic information from cameras mounted at three

selected sites downstream of all diversions established that from

September 2006 to July 2007, North Waiehu Stream was dry about 79

percent of the time, #Îao Stream was dry about 70 percent of the

time, and Waikapû Stream was dry about 37 percent of the time.

At the time of the Commission’s decision, USGS had requested, as

part of its study, to partially or fully restore mauka-to-makai

flow to Waihe#e River, Waiehu Stream, and #Îao Stream17 to allow

measurements of streamflow, infiltration, and physical habitat

for different flow conditions in sections of the stream that are

commonly dry due to diversions. The proposal sought to release

water into the streams in three phases, each involving a higher

 17
 USGS Hydrologist Delwyn Oki stated that controlled releases would
be helpful for Waikapû Stream, too, and could be developed in the future.

 58
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

flow than the last; each phase would be maintained for about a

month and long enough to allow flow conditions to stabilize for

observation.

 For Waihe#e Stream, USGS proposed flows near the coast

of 6.5 mgd, 13 mgd, and 26 mgd; this would require flows just

downstream of the Spreckels Ditch diversion of 10 mgd, 17 mgd,

and 30 mgd, respectively, for each of the three phases. For

North and South Waiehu Streams, USGS proposed flows near the

coast18 of 0.6 mgd, 1.6 mgd, and 2.6 mgd. USGS estimated that

this would require the following flows: South Waiehu Stream at

Spreckels Ditch would be 0.9 mgd, 1.3 mgd, and 1.6 mgd,

respectively; North Waiehu Stream at the North Waiehu Ditch would

be 1.6 mgd, 2.2 mgd, and 2.9 mgd, respectively. For #Îao Stream,

USGS proposed flows near the coast of 3.2 mgd, 9.7 mgd, and 16

mgd; this would require flows just downstream of the #Îao-

Maniania Ditch diversion of 9.5 mgd, 16 mgd, and 22 mgd,

respectively. For the Waikapû Stream, USGS deferred controlled

releases entirely.

 With regard to the USGS controlled release proposals,

the Commission specifically found:
 606. “The results [following the controlled releases] are
 intended to be used along with other biological and
 hydrological information in development, negotiations, or
 mediated settlements for instream flow requirements.”

 18
 Recall that the North and South Waiehu Streams join downstream of
diversions and flow together until reaching the sea.

 59
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 (Gingerich and Wolff, 2005).

The quote originated in a 2005 USGS Study of Nâ Wai #Ehâ; HC&S’s

biologist, Thomas R. Payne, quoted that language to make his

greater point that the USGS controlled releases would not be, in

his opinion, conclusive to determine IIFS. This is because the

controlled releases are designed to study the effect of flow

conditions on habitat, not to predict the biological response of

the stream to the flow condition; therefore, the scientists have

to infer the effect of streamflow on population, “without any

direct quantification or prediction of individual species.” In

Payne’s words, “considerable work remains to be done before

defensible instream flow standards could be recommended from [the

controlled release] studies alone.”

 In its Final FOF/COL19 the Commission concluded that:
 The most credible proposals for amending the IIFS are USGS’s
 proposed controlled flows. Of the three proposed phases, the
 [first] phase, totaling 12.5 mgd and comprised of 10.0 mgd
 for Waihe#e River, 1.6 mgd for North Waiehu Stream, and 0.9
 mgd for South Waiehu Stream, provide the best balance
 between instream values and offstream uses, and are the only
 viable IIFS when stream flows are low and all available
 practical alternatives are in use.

 Hui/MTF argues that the Commission “arbitrarily

misused” USGS’s temporary flow release figures, noting that the

USGS’s figures were not proposals for IIFS, but rather a proposal

for scientific study of the area. Hui/MTF argues that USGS

 19
 Dr. Miike’s Proposed FOF/COL set different IIFS, and did not reach
this finding.

 60
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

certainly did not consider instream values, and adoption of USGS

flow levels could not possibly discharge the Commission’s duty to

balance instream values and noninstream uses. OHA shares

Hui/MTF’s criticism; it describes the above-quoted COL as

“inexplicabl[e].”

 In making their argument, Hui/MTF and OHA appear to

misstate the Commission’s actual treatment of the USGS figures.

Even though COL 261, quoted above, suggests that the Commission

simply adopted the USGS figures, the entirety of the FOF/COL D&O

actually indicate that the Commission merely utilized the USGS

figures as a starting point. First, the Commission explained the

utility of the USGS figures; the figures “were chosen to

correspond to specified flows at the stream mouths, after

adjusting for losses into the stream beds in the lower reaches of

each stream.” As described earlier, the Commission focused its

analysis on establishing mauka-to-makai streamflow in streams

that would support amphidromous species; for this the USGS

estimation of loss in the streams’ losing reaches is helpful

data. Second, the Commission did not simply adopt the USGS

figures, but rather adapted one of the three USGS figures as part

of its analysis; the USGS proposed release for #Îao Stream was

9.5 mgd, but the Commission decided not to limit diversions of

that stream based on its conclusion that restoration was unlikely

to support amphidromous species. Even though, as explained

 61
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

above, this reasoning does not adequately discharge its duties in

this case, the Commission did not err in utilizing the USGS

figures as a starting point for its analysis.

D. The Commission Violated The Public Trust In Its Treatment Of
 Diversions.

 Hui/MTF argues that the Commission erred in its

estimation of HC&S, MDWS, and WWC’s diversions. Hui/MTF alleges

that the Commission did not hold the diverters to their burden of

proof and then “penalized the public trust” for the absence of

data, that the Commission failed to consider variable offstream

demands in setting the IIFS, and that the Commission did not

properly require the diverters to justify system losses. Both

Hui/MTF and OHA argue that the Commission erred in its

consideration of Well No. 7; Hui/MTF also argues that the

Commission erred in its consideration of recycled water as an

alternative source. Finally, Hui/MTF contends that the

Commission erred in calculating HC&S’s acreages. The following

sections consider each argument in turn.

 1. The Commission Did Not Err In Articulating The Burden
 Of Proof In Determining An IIFS.

 Hui/MTF argues that the Commission erred because it did

not hold the diverting parties to a burden of proof; they argue

that Waiâhole I requires noninstream users to justify their

diversions in light of the water uses protected by the public

trust. The flaw of their argument is that the portions of

 62
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Waiâhole I that they cite apply to the WUPA process. In the

context of IIFS petitions, the water code does not place a burden

of proof on any particular party; instead, the water code and our

case law interpreting the code have affirmed the Commission’s

duty to establish IIFS that “protect instream values to the

extent practicable” and “protect the public interest.” In re

Water Use Permit Applications “Waiâhole II”, 105 Hawai#i 1, 11,

93 P.3d 643, 653 (2004); HRS § 174C-71(2)(A). Accordingly, our

review of the Commission’s analysis of the stream diversions must

focus on whether or not the Commission properly discharged this

duty. Where the Commission’s decisionmaking evinces “a level of

openness, diligence, and foresight commensurate with the high

priority these rights command under the laws of our state,” the

decision satisfies close look review governing public trust

resources. Wai#ola, 103 Hawai#i at 422, 83 P.3d at 685.

 2. The Commission Did Not Err In Using Dr. Fares’s Model
 Of Irrigation Requirements As A Starting Point For
 Analysis.

 Hui/MTF argues that the Commission erred in its

treatment of testimony from Dr. Ali Fares, a hydrologist who

testified as an expert witness for Hui/MTF, OHA, and MDWS. Dr.

Fares is an Associate Professor in the Department of Natural

Resources and Environmental Management at the University of

Hawai#i, Mânoa. Dr. Fares testified regarding his estimation of

the optimal irrigation requirements for HC&S’s sugar cane fields.

 63
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Dr. Fares’s model considered historical rainfall data,

evapotranspiration or pan evaporation data20, and data regarding

the soil; he then calculated, over the historical period covered

by the rainfall data, how much irrigation water would have been

required to grow the sugar crop. Dr. Fares statistically

analyzed the results to calculate the average amount of

irrigation water needed in the wettest year and the driest year,

as well as the amount of water that would have supplied the

irrigation requirement between the two extremes. Dr. Fares

calculated the optimal irrigation requirements using the 80

percent probability standard because it’s the industry standard

utilized in both government and the private sector. Under the 80

percent probability standard, water meeting or exceeding

requirements is available four out of every five days.

 HC&S employees testified that they used a different

model called a water balance model, which differs from Fares’s

model in that it uses “real-time data” collected from four rain

stations and two evaporation stations located in the west Maui

fields. The Commission found that real-time data is more

reliable than long-term daily averages to calculate irrigation

requirements.

 20
 Evotranspiration (or evapo-transpiration) is the loss of water
from the soil by evaporation and by transpiration from plants growing in the
soil. Pan evaporation is a measurement of water from an open pan, which can
be correlated to the water demands of a specific crop.

 64
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 Both models also consider irrigation efficiency, or the

percentage of water that is actually delivered to the plants, as

opposed to the amount that is channeled through, and possibly

lost in, the irrigation system. Fares used an 85 percent

irrigation efficiency figure for his calculations; this is

industry standard. HC&S’s estimations takes into account the

different types of tubing, the length of tubes, and variations in

topography; HC&S’s estimations utilize an 80 percent efficiency

standard. The Commission accepted Fares’s use of 85 percent

irrigation efficiency.

 HC&S stressed the importance of basing water management

on actual field conditions, rather than models. The Commission

found that Fares had not personally visited the HC&S fields or

inspected the HC&S irrigation system; he also never studied

actual water usage for sugar cane. Moreover, HC&S

representatives testified that Fares’s model does not account for

several factors increasing water usage, including water run

through irrigation lines to detect leaks and irrigation water

that is “lost” because it is applied just before it rains. HC&S

also testified that it is impractical to assume that HC&S can

irrigate to restore soil moisture exactly when necessary; this is

not always the case for several reasons, including the facts that

only a fraction of the fields actually receive water at any given

time, and sometimes fertilizers and herbicides preclude watering.

 65
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 In its FOF/COL D&O, the Commission accepted Fares’s

estimates of irrigation requirements, but added five percent to

account for the above-listed factors identified by HC&S that

Fares’s model does not incorporate. Hui/MTF argue that this was

error because the five percent increase is “random” and accounts

for “unsubstantiated excuses.” HC&S responds that the Commission

was not limited to choosing between Dr. Fares’s model and HC&S’s

estimates, but rather that the Commission was empowered to

utilize the information presented as it saw fit, as long as its

decision was supported by the evidence.

 The court has held that, due to the fact that the

Commission must articulate an IIFS at an “early planning stage”

of water management, the Commission “need only reasonably

estimate instream and offstream demands.” Waiâhole I, 94 Hawai#i

at 155 n.60, 9 P.3d at 467 n.60. The court also explained that

the IIFS may be based “not only on scientifically proven facts,

but also on future predictions, generalized assumptions, and

policy judgments.” Waiâhole I, 94 Hawai#i at 155, 9 P.3d at 467.

In this case, the Commission concluded, based on the above-listed

facts showing an incongruity between Fares’s model and field

conditions, that the model would be insufficient to quantify

actual irrigation requirements. The Commission then added five

percent to Fares’s figures to account for this difference. The

Commission fully explained its logic in predicting the irrigation

 66
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

requirements, and it settled on a figure that is a small

deviation from the Hui/MTF expert’s proposal. Faced with the

question of whether the record lacks substantial evidence to

support the estimates, the answer must be no; the court therefore

concludes that the Commission did not err in its use of Fares’s

model numbers as a starting point in articulating irrigation

requirements for HC&S’s fields.

 3. The Commission Erred In Calculating HC&S’s Acreage.

 Hui/MTF argues that the Commission erred in including

fields 921 and 922 when calculating HC&S’s acreage. Hui/MTF

alleges error on two grounds: first, the Commission wrongfully

took judicial notice of facts affecting an alternative water

source for the fields, and second, the soil quality of fields 921

and 922 is poor and it is unreasonable to provide fresh water to

cultivate them.

 As the Commission found, fields 921 and 922 are sandy

“scrub land” that HC&S had never cultivated until sometime

between 1995 and 1997 when it entered into an agreement with Maui

Land and Pine (“MLP”), under which MLP delivered wastewater from

its pineapple cannery to irrigate the fields for seed cane.

After the close of evidence, the Commission took judicial notice

of newspaper reports that: (1) MLP announced that it would cease

pineapple operations, (2) Haliimaile Pineapple Company would

“revive” the fresh fruit operations, and (3) this “should not

 67
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

result in a restoration of the wastewater source.” Hui/MTF

argues that it was error for the Commission to take judicial

notice of these three “facts”.

 Hawai#i Rules of Evidence (“HRE”) Rule 201, limits the

scope of judicial notice to facts “not subject to reasonable

dispute in that it is either (1) generally known within the

territorial jurisdiction of the trial court, or (2) capable of

accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned.” HRE Rule 201(b). In

this case, the Commission took judicial notice of facts presented

in two newspaper articles. There is precedent for taking

judicial notice of facts as reported by newspapers. Application

of Pioneer Mill Co., 53 Haw. 496, 497 n.1, 497 P.2d 549, 551 n.1

(taking judicial notice that a land court judge had announced his

candidacy for public office, based upon newspaper articles

submitted by the parties). In this case, however, the Commission

went further than taking notice of facts reported in newspapers:

it predicted the impact of those facts on HC&S’s water supply.

HRE Rule 201 does not permit the Commission to take judicial

notice of a possible effect of a change in ownership in the

pineapple cannery. First, this prediction fits neither prong of

the relevant rule of evidence; the effect of the change of

ownership on HC&S’s water supply is neither “generally known

within the territorial jurisdiction” nor “capable of accurate and

 68
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

ready determination by resort to sources whose accuracy cannot

reasonably be questioned.” HRE Rule 201(b). Second, the

prediction that wastewater will no longer be available is purely

speculative. In fact, one of the Commission’s FOF contradicts

this speculation, stating “due to the shutdown of MLP’s cannery

operation, MLP mill wastewater will only be able to supply

approximately half of the irrigation requirements of Fields 921

and 922 in the future.” Furthermore, it is entirely possible

that the company that “revived” operations also “revived” the

practice of providing wastewater to HC&S. Hui/MTF are correct

that the Commission’s taking judicial notice in this instance was

improper.

 Hui/MTF also argues that the Commission erred in

permitting HC&S to include fields 921 and 922 in its acreage

because it is marginal farm land, or, as found by the Commission,

“sandy ‘scrub land.’” Hui/MTF argues that the burden is on HC&S

to show “the propriety of draining water from public streams” to

irrigate this land which had been uncultivated until a wastewater

source was available.

 The Commission found that fields 921 and 922 are

similar to field 920, another “sandy ‘scrub land’” field on which

HC&S ceased cultivation because it “has a very sandy soil and has

consumed more water than other fields.” The Commission also

explicitly excluded field 920 from HC&S’s acreage and water duty

 69
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

calculations, “because it has consumed more water because of the

porosity of its sandy soil and its use for seed cane.” HC&S

points to testimony from HC&S’s agronomist that HC&S is able to

grow sugar on those fields because the sandy area has loam soil

underneath it, thus permitting HC&S to achieve “good crop

growth.” Though HC&S draws the court’s attention to this

testimony in its briefing, this testimony is not included in the

Commission’s FOF/COL D&O. In fact, the Commission found no

explicit facts regarding the propriety of cultivating the fields;

instead the Commission included fields 921 and 922 in HC&S’s

acreage without explanation. As evinced by HC&S’s and the

Commission’s treatment of field 920, the wisdom of irrigating

fields 921 and 922 with Nâ Wai #Ehâ water is questionable. The

record does not contain sufficient analysis to support the

conclusion that fields 921 and 922 should be treated differently

from field 920. Similarly, the record does not contain

sufficient analysis showing that the Commission considered these

fields with “a level of openness, diligence, and foresight”

required when authorizing the diversion of our public trust res.

On remand, the Commission must reevaluate its determination that

HC&S should be permitted to divert Nâ Wai #Ehâ water to irrigate

fields 921 and 922.

 70
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 4. The Commission Erred In Its Treatment Of Some Of The
 Diverters’ System Losses.

 Hui/MTF also argues that the Commission erred in

failing to hold HC&S and WWC to their burdens of proof regarding

losses. Hui/MTF contends that diverting parties bear a burden of

justifying losses and adopting practicable mitigation. WWC

argues that there is no burden of proof on diverting parties in

an IIFS proceeding; WWC also notes that “[n]othing within HRS §

174C-71(2) mandates that the Commission consider or not consider

system losses. Likewise nothing within the public trust doctrine

mandates that the Commission consider or not consider system

losses.” HC&S responds that “some system loss, such as

evaporation from open ditches and reservoirs, is unavoidable and

not unreasonable,” and that the Commission’s determination of

system losses is reasonable and not clearly erroneous.

 With regard to losses, the Commission found:
 375. The great majority of WWC’s ditches are open and
 unlined. All of WWC’s reservoirs are unlined.

 376. WWC did not address the feasibility of minimizing the
 losses from its system except to state that it “may . . . in
 the future” have plans to line the unlined portions of their
 system.

 [. . .]

 423. HC&S estimates that it loses 6-8 mgd through seepage
 from the Waiale reservoir, depending on the level of the
 reservoir. Seepage throughout the rest of the HC&S ditch and
 reservoir system is estimated to be 3-4 mgd.

 [. . .]

 425. HC&S acknowledges that “high density polyethylene
 lining could negate much of the seepage, not all of it” and
 that concrete lining “is obviously another option.” HC&S

 71
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 has no estimates of the cost to line Waiale Reservoir or the
 other reservoirs and ditches and has undertaken no
 engineering or financial analysis of what it would take to
 reduce the losses.

The Commission concluded that WWC and HC&S have “not established

the lack of practicable mitigating measures to address these

losses.” The Commission then “assum[ed]” that “losses could be

halved” by lining most of WWC’s reservoirs, and concluded that

WWC’s reasonable losses are 2.0 mgd. The Commission also deemed

HC&S’s reasonable losses to be 2.0 mgd, after estimating that

HC&S could line the Waiale Reservoir to prevent 6-8 mgd, and,

like WWC, could halve remaining losses.

 First, in considering these losses, it is necessary to

recognize the magnitude of the losses. If the Commission’s

estimates are correct and system losses run between 13-16 mgd21,

then the minimal estimation of that loss is approximately twice

the 6.84 mgd the Commission estimated for deliveries to all

kuleana system users in Nâ Wai #Ehâ. The lowest estimation of

losses, 13 mgd, is higher than the total volume that the final

IIFS restore to the Waihe#e and Waiehu Streams.22 Briefly stated,

losses in the water system of Nâ Wai #Ehâ are massive. The

Commission’s order that HC&S line the Waiale Reservoir to prevent

a large portion of these losses is commendable and shows the

 21
 This includes 6-8 mgd for the Waiale Reservoir, 3-4 mgd for HC&S’s
water system, and 4 mgd for WWC’s water system.

 22
 This includes 10 mgd for Waihe#e Stream, 1.6 mgd for North Waiehu
Stream, and 0.9 mgd for South Waiehu Stream, for a total of 12.5 mgd.

 72
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

“diligence” and “foresight” expected of the Commission in its

management of the public trust.

 Second, WWC contends that the Commission, when setting

an IIFS, does not have to consider system losses. The Commission

does not respond to the argument in its answering brief, but the

water code indicates that a diverter’s system losses may factor

into the Commission’s estimations of noninstream uses when it

sets an IIFS. The statute articulating the IIFS standards

mandates that the Commission “weigh the importance of the present

or potential instream values with the importance of the present

or potential uses of water for noninstream purposes, including

the economic impact of restricting such uses[.]” HRS § 174C-

71(2)(D). The plain meaning of the word “importance” requires

the Commission to judge the value of a party’s noninstream use

against the other present or potential uses. The value of

diverting water, only to lose the water due to avoidable or

unreasonable circumstances is unlikely to outweigh the value of

retaining the water for instream uses. Therefore, the Commission

did not err in considering losses.

 However, it appears that the Commission erred in its

articulation of the burden of proof regarding losses. The

Commission’s FOF/COL D&O twice cites Waiâhole I and Waiâhole II

for authority that “[o]ffstream users have the burden to prove

that any system losses are reasonable-beneficial by establishing

 73
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

the lack of practicable mitigation measures, including repairs,

maintenance, and lining of ditches and reservoirs.” The

Commission erred placing the burden of proof on the parties in

the IIFS proceeding, as the authorities cited by the Commission

apply in the context of a WUPA. In Waiâhole I, the cited

discussion of losses considered Waiâhole Irrigation Company’s

(“WIC”) request for 2.0 mgd to compensate for the losses of its

ditch system. 94 Hawai#i at 118, 9 P.3d at 430. There, the

Commission denied WIC’s request, but suggested that WIC could

draw “non-regulated” surface water to cover the losses; on

appeal, this court concluded that the Commission’s suggestion was

erroneous for several reasons, and held that the Commission must

consider the 2.0 mgd as a “‘use’ pursuant to the permitting

process.” 94 Hawai#i at 118, 173, 9 P.3d at 430, 485. On

remand, the Commission found that “[o]perational losses are a

normal component of any water delivery system” and therefore

issued a permit to WIC’s successor in interest, Agribusiness

Development Corporation (“ADC”), to cover the losses. Waiâhole

II, 105 Hawai#i at 27, 93 P.3d at 669. When that decision

returned to this court on further appeal, this court held that

the Commission’s decision was incomplete because it did not

include findings that ADC met its burden as a permit holder

 74
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

pursuant to HRS § 174C-49(a)23. Id. This burden is articulated

in the WUPA statute, but is absent from the statutes governing

IIFS. The Commission erred when it imposed a WUPA burden on the

diverting parties in the IIFS CCH. As noted above, the burden in

setting an IIFS is on the Commission to “protect instream values

to the extent practicable.” Waiâhole II, 105 Hawai#i at 11, 93

P.3d at 653; HRS § 174C-71(2)(A).

 The court concludes that the Commission did not meet

this burden when it “assum[ed]” that WWC’s and HC&S’s losses

could be halved. As discussed above, the court has held that,

due to the fact that the Commission must articulate an IIFS at an

“early planning stage,” the Commission “need only reasonably

estimate instream and offstream demands.” Waiâhole I, 94 Hawai#i

at 155 n.60, 9 P.3d at 467 n.60. Though reasonable estimates are

 23
 HRS § 174C-49(a) states that “[t]o obtain a permit pursuant to
this part, the applicant shall establish that the proposed use of water:

 (1) Can be accommodated with the available water source;

 (2) Is a reasonable-beneficial use as defined in section 174C-3;

 (3) Will not interfere with any existing legal use of water;

 (4) Is consistent with the public interest;

 (5) Is consistent with state and county general plans and land use
 designations;

 (6) Is consistent with county land use plans and policies; and

 (7) Will not interfere with the rights of the department of
 Hawaiian home lands as provided in section 221 of the
 Hawaiian Homes Commission Act.

 HRS § 174C-49(a) (1993).

 75
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

permitted at this stage, the Commission did not provide any

analysis on how it reached that figure to show that it had

“reasonably estimate[d]” that half of the losses could be

eliminated. In choosing a number that appears to be arbitrary,

the Commission could have significantly over- or underestimated

the potential for mitigation of losses in HC&S’s and WWC’s water

systems. On remand, the Commission must “reasonably estimate”

losses, mindful of its duty to “protect instream values to the

extent practicable.”

 5. The Commission Erred In Its Consideration Of HC&S’s
 Well No. 7.

 Hui/MTF argues that the Commission arbitrarily

minimized Well No. 7’s potential contributions. OHA raises a

similar challenge regarding Well No. 7; it contends that the

Commission did not properly weigh HC&S’s potential use from the

well. More specifically, OHA claims that HC&S did not

demonstrate that Well No. 7 is not a practicable alternative, and

that the Commission’s lowering of Well No. 7’s yield was

arbitrary and capricious.

 Well No. 7 is the only one of HC&S’s sixteen brackish

water wells on its plantation that is able to introduce water

into HC&S’s internal ditch system. From 1927 until the 1980s,

Well No. 7 was HC&S’s primary source of irrigation water for the

3,650-acre Waihe#e-Hopoi Fields; HC&S pumped an average of about

 76
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

21 mgd from Well No. 7 until 1988, when a competing sugar company

ceased operations, freeing up a great amount of Nâ Wai #Ehâ water

for HC&S use. For the past twenty-five years, HC&S has minimized

use of Well No. 7, but it has occasionally used the well; in

fact, it used the well heavily on two occasions: for six months

from June through November of 1996, HC&S pumped an average of 25

mgd, and for six months from May through October 2000, HC&S

pumped an average of 18.9 mgd.

 Well No. 7 is currently configured with three pumps:

pumps 7A and 7B are at water level and can each pump 17.5 mgd to

ground level, for a total of 35 mgd, which it can distribute to

about 800 acres of the 3,650 acres of the Waihe#e-Hopoi Fields.

The third pump, Pump 7C, is a booster pump at ground level that

HC&S claims can pump 14 mgd24 from pump 7A to Waihe#e Ditch for

distribution to all of the Waihe#e-Hopoi Fields except for the

175-acre Field 715.

 During the hearings, HC&S offered four explanations for

its argument that it would be impracticable to rely heavily on

water pumped from Well No. 7. First, HC&S estimates that it

would incur an estimated $1 million dollars in capital costs to

install new pipelines and pumps. Second, HC&S claims that it

 24
 The Commission’s FOF indicate suspicion about the accuracy of this
figure. FOF 497 states, “According to HC&S, as currently configured, Well No.
7 can supply only 14 mgd to the Waihe#e-Hopoi Fields, with the exception of
Field 715. However, HC&S’s records do not indicate that Well. No. 7 was ever
configured differently than its current configuration.”

 77
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

does not have adequate electrical power to run the pumps on a

consistent and sustained basis because of its power contract with

Maui Electric Company (“MECO”). HC&S estimates it would incur

costs of $777,650 to upgrade its pumps and electrical equipment

to meet MECO’s standards for servicing such equipment; HC&S also

claims it would cost $7,440 per day for energy to run Well No. 7,

and that HC&S would lose $1.8 million in revenues under its

contract with MECO as well as a decrease in HC&S’s avoided cost

rate and penalties three times the power rate for power it does

not deliver. Third, HC&S claims that increased pumping would

exacerbate the degree to which sustainable yield is already being

exceeded and reduce the recharge from the imported surface water

that sustains the Kahului aquifer. Fourth, HC&S claims that

increased pumping of the well would increase the salinity of the

water.

 The Commission’s Final D&O considered the first three

factors listed above (the capital costs, energy costs, and

aquifer recharge) and determined that HC&S must pump only 9.5 mgd

from Well No. 7. The Commission determined that Well No. 7 is an

alternative that most likely would not be available on a daily

basis, citing the uncertainties about the recharge rate and

electrical power. In determining that HC&S must pump 9.5 mgd,

the Commission required that HC&S pay additional energy costs to

pump the water, but did not require HC&S to accrue any capital

 78
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

costs. The D&O requires HC&S to provide monthly ground water use

reports documenting the volume of water pumped from Well No. 7,

along with ground water levels and salinity measurements.

 In his dissent, Dr. Miike criticized the Commission

majority for its treatment of Well No. 7, writing that the 9.5

mgd figure is “without any credible foundation.” This is a main

point of error on appeal for Hui/MTF and OHA; they argue that the

Commission arbitrarily minimized Well No. 7’s potential

contributions as an alternative source to Nâ Wai #Ehâ water.

 The Commission’s response is contradictory and makes it

clear that guidance is necessary in this area. First, the

Commission responds that “neither the statutes nor the

administrative rules require an analysis of practicable

alternatives in setting the IIFS.” The Commission then asserts

that Well No. 7 “had a place” in the IIFS analysis because it is

a consideration when weighing instream values with offstream

purposes when establishing the IIFS.

 The analysis with regard to alternative sources is

similar to the analysis with regard to system losses, supra. The

water code requires the Commission to “weigh the importance of

the present or potential instream values with the importance of

the present or potential uses of water for noninstream purposes,

including the economic impact of restricting such uses[.]” HRS §

174C-71(2)(D). The plain meaning of the word “importance”

 79
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

requires the Commission to judge the value of a party’s

noninstream use against the other present or potential uses.

Furthermore, as the water code’s Declaration of Policy explains,

“[t]he state water code shall be liberally interpreted to obtain

maximum beneficial use of the waters of the State . . . .” HRS §

174C-2(c) (1993). Allowing a water user to divert water from the

public trust res when that user has exclusive access to an

alternative water source that is currently un- or under-used

would not effect the Legislature’s policy as expressed in the

water code. This suggests that the Commission’s second argument

is correct; Well No. 7, as an alternative source, “has a place”

in the analysis of setting an IIFS because the availability of

alternative water sources necessarily diminishes the “importance”

of diverting Nâ Wai #Ehâ water for noninstream use.

 Hui/MTF, OHA, HC&S, and WWC do not dispute the

relevance of Well No. 7 water to the IIFS analysis; they do,

however, disagree on whether the diverting party bears a burden

of proof with regard to this point of analysis. Hui/MTF argues

that HC&S bears a burden to prove that using Well No. 7 is not

practicable, and that the Commission is “duty bound” to hold HC&S

to its burden. OHA agrees that the burden falls to HC&S to

demonstrate that Well No. 7 is not a practicable alternative.

HC&S and WWC both argue that the burden falls to the Commission

to determine IIFS that best serve the public interest. The

 80
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Commission’s FOF/COL D&O does not specify a burden of proof for

alternative sources, as it did for system losses. In its

introduction, however, the Commission does specify a general

standard that “[f]or those seeking private, commercial uses of

water, there is a higher level of scrutiny. In practical terms,

this means that the burden ultimately lies with those seeking or

approving such uses to justify them in light of the purposes

protected by the trust.” More specific to alternative sources,

the Commission stated that it “is not obliged to ensure that any

particular user enjoys a subsidy or guaranteed access to less

expensive water sources when alternatives are available and

public values are at stake,” and also that “[a]n applicant’s

inability to afford an alternative source of water, standing

alone, does not render that alternative impracticable.”

 In evaluating Well No. 7 and HC&S’s four arguments

listed above, the Commission found the following:
 494. [. . .] From 1927 until additional Na Wai ‘Eha water
 became available in the l980s, HC&S’s primary source of
 irrigation water for its Waihe#e-Hopoi Fields was Well No.
 7, [. . .] a brackish water well.

 495. Between 1927 and 1985, HC&S pumped an average of about
 21 mgd from Well No. 7. Since the additional Na Wai ‘Eha
 flows became available. HC&S has minimized its use of Well
 No. 7 but used it heavily on to occasions: e.g., for the
 six-month period from June through November of 1996, an
 average of 25 mgd was pumped; and for the six-month period
 from May through October of 2000, an average of 18.9 mgd was
 pumped.

 [. . .]

 497. According to HC&S, as currently configured, Well No. 7
 can supply only 14 mgd to the Waihe#e-Hopoi Fields, with the

 81
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

 exception of Field 715. However, HC&S’s records do not
 indicate that Well No. 7 was ever configured differently
 than its current configuration.

 498. HC&S estimates that it would cost approximately
 $525,000 to add another booster pump and additional
 distribution pipeline to increase the volume that can be
 pumped from Well No. 7 to HC&S’s Waihe#e Ditch from 14 mgd
 to 28 mgd; and the cost of an additional pipeline to reach
 Field 715 would be $475,000.

 499. HC&S also claims that it does not have adequate
 electrical power to run the pumps for Well No. 7 on a
 consistent and sustained basis because of its power contract
 with Maui Electric Company (“MECO”) and limitations of its
 capacity to generate electricity through its system of
 burning bagasse and other supplemental fuels in its power
 plant and the operation of its hydro power turbines on its
 ditch system which are supplied by East Maui water[.]

 500. HC&S also claims that any increased pumping of water
 from the Kahului aquifer to replace surface water being
 imported from the West Maui Ditch System would both
 exacerbate the degree to which the sustainable yield is
 already being exceeded and reduce the recharge from imported
 surface water that sustains the aquifer.

These findings of fact are plainly descriptions of testimony. In

its conclusions of law section examining “Reasonable Offstream

Uses,” the Commission restated several of these “findings,”

indicating that the Commission adopted the testimony as fact.

The Commission then stated
 The combined facts that the current sustainable yield of the
 aquifer is already being exceeded; that increased pumping
 from Well No. 7 may exacerbate that strain; and that the
 historically higher levels of pumping occurred during a
 period where furrow irrigation methods were affecting
 recharge rates for the aquifer, the practical alternative
 from Well No. 7 is lower than historic rates. Considering
 these uncertainties in combination with the Commission’s
 decision to place the full burden of remedying losses
 immediately upon HC&S, discussed intra, the practical
 alternative from Well No. 7 is deemed 9.5 mgd. This
 alternative will not require capital costs, only the costs
 of pumping.

 The Commission erred in adopting HC&S’s testimony

without any assessment of the evidence on the record that

 82
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

contradicted HC&S’s arguments. As the court explained in

Waiâhole I, where “the record demonstrates considerable conflict

or uncertainty in the evidence, the agency must articulate its

factual analysis with reasonable clarity, giving some reason for

discounting the evidence rejected.” 94 Hawai#i at 163-64, 9 P.3d

at 475-76. The record shows that the Commission did not explain

its analysis with “reasonable clarity” regarding any of the

“facts” recited above.

 For example, OHA shows that, with regard to HC&S’s

claim that pumping Well No. 7 would result in a diminished

aquifer, HC&S had represented the exact opposite to the

Commission in another context but around the same time as the

hearings in this case. OHA’s exhibit C-90 is a letter dated

January 11, 2008 to the Commission from HC&S’s Senior Vice

President, Rick Volner, regarding the Public Review Draft Water

Resource Protection Plan (“WRPP”) for parts of West Maui,

including the Kahului aquifer. In its letter, HC&S states that

it has five wells in the Kahului aquifer and eleven wells in the

Pâ#ia aquifer. HC&S writes
 Over the last twenty years, the daily average rate of
 withdrawal, by year, for all 16 of these wells combined has
 ranged from approximately 40 mgd to as much as 112 mgd far
 in excess of the combined sustainable yield of between 7 and
 8 mgd for the Kahului and Paia aquifers recommended in the
 Draft WRPP. Several of these wells have been in operation
 for more than a hundred years, and all have been in place
 and operated for many decades without any long term
 deterioration in water quality.

Though these written comments contradict the evidence it

 83
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

presented regarding its inability to pump Well No. 7 due to the

alleged recharge problem, the Commission does not explain why it

disregarded the written comments in favor of HC&S’s evidence

supporting the existence of a recharge problem.

 The Commission attempted to analyze the economic impact

of requiring HC&S to augment Nâ Wai #Ehâ water with water from

Well No. 7. HC&S claimed that the economic consequences of

reduced allowable diversion or increased requirements to pump

Well No. 7 would result in HC&S discontinuing all operations on

Maui. The Commission found that:
 HC&S had not “done any economic analysis on how a reduction
 of available surface water in this case would force HC&S to
 shut down”; Mr. Holiday[, President of HC&S’s Agricultural
 Group,] “[could not] say yes or no” when asked whether
 shifting 9 mgd of Nâ Wai #Ehâ surface water to another
 purpose would prevent HC&S from being viable, but testified
 that HC&S is “assuming” that impact “for planning purposes.”

As the Commission recited in its FOF/COL, Catherine Chan-

Halbrendt, Professor in the Department of Natural Resources and

Environmental Management at the University of Hawai#i, Mânoa,

testified that “the lack of any economic analysis, or the data

required to conduct such an analysis, prevents anyone, including

this Commission, from evaluating HC&S’s claims of economic

impact.” The Commission agreed that the record was insufficient,

stating “It would have been more helpful to the Commission if

either or both parties had provided information on incremental

decreases in surface water to the 5,000 acres of HC&S’s West Maui

 84
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Fields.” Nonetheless, the Commission stated that “the lack of

such analyses does not prohibit the Commission from its duty of

weighing instream values with non-instream uses.”

 The record shows, however, that the Commission did not

merely weigh instream values with noninstream uses; rather, the

Commission’s own explanation of how it arrived at the 9.5 mgd

requirement shows that cost to HC&S was the determinative factor.

The Commission concluded first that there were uncertainties

regarding the aquifer recharge, and that therefore “the practical

alternative from Well No. 7 is lower than historic rates.” That

is, even though the Commission found that historical rates for

Well No. 7 showed that “[b]etween 1927 and 1985, HC&S pumped an

average of about 21 mgd from Well No. 7,” the Commission decided

that a lower number would be more appropriate. Then, in

determining that lower number, the Commission explained:
 Considering these uncertainties [regarding aquifer recharge]
 in combination with the Commission’s decision to place the
 full burden of remedying losses immediately upon HC&S,
 discussed intra, the practical alternative from Well No. 7
 is deemed 9.5 mgd. This alternative will not require
 capital costs, only the costs of pumping.

(emphasis added). That is, since the Commission already required

HC&S to pay to eliminate some of its system losses, it would not

require HC&S to incur any capital costs to improve Well No. 7.

 The Commission erred when it made its decision

regarding Well No. 7 based on cost while explicitly acknowledging

that it did not have the data it needed to truly analyze cost.

 85
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

“[T]he Commission must not relegate itself to the role of a mere

‘umpire passively calling balls and strikes for adversaries

appearing before it,’ but instead must take the initiative in

considering, protecting, and advancing public rights in the

resource at every stage of the planning and decisionmaking

process.” Waiâhole I, 94 Hawai#i at 143, 9 P.3d at 455

(citations). When such critical information is missing, the

Commission must “take the initiative” to obtain the information

it needs. Where the Commission’s decisionmaking does not display

“a level of openness, diligence, and foresight commensurate with

the high priority these rights command under the laws of our

state,” the decision cannot stand. Wai#ola, 103 Hawai#i at 422,

83 P.3d at 685. On remand, the Commission must revisit its

analysis of Well No. 7 as an alternative source to diverting Nâ

Wai #Ehâ water, as explained in this opinion.

6. The Commission Erred In Its Consideration of Recycled
 Wastewater.

 Hui/MTF argues that the Commission erred in failing to

consider the practicability of using recycled wastewater from the

Wailuku/Kahului wastewater treatment plant. In its FOF/COL D&O,

the Commission concluded that at least 5 mgd of recycled

wastewater “is currently disposed of via underground injection.”

In response to Hui/MTF’s urging that HC&S be required to utilize

this water, the Commission found that “the County currently has

 86
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

no existing infrastructure to deliver recycled wastewater to

HC&S’s fields.” The Commission also heard testimony that

“private parties could construct their own pipeline to the

plant.” The Commission appears to have concluded that this

alternative did not merit consideration, based solely on the

current lack of infrastructure. This decision does not evince “a

level of openness, diligence, and foresight commensurate with the

high priority these rights command under the laws of our state.”

Wai#ola, 103 Hawai#i at 422, 83 P.3d at 685. The recycled

wastewater was quantified as “at least 5 mgd”; 5 mgd is nearly

enough water to satisfy all kuleana users in Nâ Wai #Ehâ and

would be a significant contribution to HC&S’s water needs. On

remand, the Commission must evaluate this alternative with

“openness, diligence, and foresight” to determine whether it is a

viable alternative to diverting Nâ Wai #Ehâ water.

 VI. CONCLUSION

 As explained in Section V.A., supra, MDWS’s cross-

appeal is dismissed.

 We recognize and appreciate the substantial time,

energy, and diligence that the Commission, Dr. Miike, and the

parties have invested in this case. However, for the reasons

stated above, the Commission on Water Resource Management’s

June 10, 2010 Findings of Fact, Conclusions of Law, Decision and

 87
 *** FOR PUBLICATION IN WEST’S HAWAII REPORTS AND PACIFIC REPORTER ***

Order is hereby vacated and remanded to the Commission for

further proceedings consistent with this opinion.

Isaac H. Moriwake and /s/ Mark E. Recktenwald
D. Kapua#ala Sproat of
Earthjustice for Appellant /s/ Paula A. Nakayama
Hui O Nâ Wai #Ehâ and
Maui Tomorrow Foundation, Inc. /s/ Sabrina S. McKenna

Anna Elento-Sneed and /s/ Rom A. Trader
Pamela W. Bunn of Alston Hunt
Floyd & Ing for Appellant
Office of Hawaiian Affairs

Patrick K. Wong, Corporation
Counsel and Jane E. Lovell,
Deputy Corporation Counsel,
County of Maui, and Jon M.
Van Dyke, for Appellee/Cross-
Appellant County of Maui,
Department of Water Supply

Donna H. Kalama and Julie H.
China, Deputy Attorneys
General, for Appellee
Commission on Water Resource
Management

David Schulmeister and Elijah
Yip of Cades Schutte LLP for
Appellee Hawaiian Commercial
and Sugar Company

Paul R. Mancini and James W.
Geiger of Mancini, Welch &
Geiger and Gilbert S.C. Keith-
Agaran for Appellee Wailuku
Water Company, LLC

 88